In the

# United States Court of Appeals
### For the Seventh Circuit

———————

No. 05-1620

BENJAMIN PRUITT,

*Plaintiff-Appellant,*

*v.*

STEPHEN D. MOTE, Warden,
ADELLA JORDAN-LUSTER,
PATRICIA BEODECKER, Officer,
MICHAEL P. MESCH, Officer, and
WESLEY G. WILES, Officer,

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Central District of Illinois.
No. 03 C 1030—**Harold A. Baker**, *Judge.*

———————

REARGUED EN BANC MAY 22, 2007—DECIDED OCTOBER 3, 2007

———————

Before EASTERBROOK, *Chief Judge*, and POSNER, COFFEY, RIPPLE, MANION, KANNE, ROVNER, WOOD, EVANS, WILLIAMS, and SYKES, *Circuit Judges*.[Œ]

SYKES, *Circuit Judge*. Benjamin Pruitt, an inmate at the Pontiac Correctional Center in Illinois, filed a lawsuit under 42 U.S.C. § 1983 alleging he was sexually assaulted

———————

[Œ] The Honorable Joel M. Flaum took no part in the consideration or decision of this case.

by a prison guard and that prison employees failed to protect him from this assault. Prior to trial Pruitt filed four motions asking the district court to appoint an attorney to represent him. With the last two motions, Pruitt submitted the results of prison tests showing he had the educational level of an early sixth grader (his composite math and reading scores put him at grade level 6.2). The court denied each of these motions with a brief, conclusory order, observing each time that the case was not "so complex or intricate that a trained attorney is necessary." Proceeding pro se, Pruitt tried his claims before a jury and lost. The sole issue on appeal is the district court's denial of Pruitt's motions for appointment of counsel.

We reverse. Although there is no constitutional or statutory right to court-appointed counsel in federal civil litigation, an indigent civil litigant may ask the district court to request an attorney to represent him *pro bono publico. See* 28 U.S.C. § 1915(e)(1) (in proceedings *in forma pauperis,* "[t]he court may request an attorney to represent any person unable to afford counsel"). The district court construed Pruitt's motions as requests for pro bono counsel under § 1915(e)(1) and summarily denied them. In doing so, the court addressed only the complexity of the case, omitting any inquiry into Pruitt's competence to litigate his own claims.

This circuit's legal standard for resolving § 1915(e)(1) motions requires the district court to consider *both* the difficulty of the case *and* the pro se plaintiff's competence to litigate it himself. Although the decision whether to recruit counsel is discretionary and our review deferential, here the district court applied only half of the prevailing legal standard, and that is necessarily an abuse of discretion. The court's error was not harmless; there is a reasonable likelihood that assistance of counsel would have made a difference in the outcome of Pruitt's case. This

is not to say there is a presumption in favor of recruiting pro bono counsel for indigent civil litigants with cases and educational deficits like Pruitt's. We hold only that the district court's failure to apply the proper legal standard means the decision was incorrect when made and the error was ultimately prejudicial in light of the total record. The ordinary remedy in this situation is remand for retrial of Pruitt's claims, with the assistance of recruited pro bono counsel.

## I.  Background

### A.  Pretrial Proceedings

In January 2003 Benjamin Pruitt filed a petition to proceed *in forma pauperis* in the Central District of Illinois, accompanied by a pro se complaint against various employees at the Pontiac Correctional Center seeking relief under 42 U.S.C. § 1983 for violations of the Eighth Amendment.[1] Pruitt alleged that Michael Mesch, a corrections officer at Pontiac, took him into a prison bathroom, ordered him to remove his clothes for a strip search, and sexually assaulted him by fondling his penis. Pruitt also claimed prison officials failed to respond to his complaints regarding Mesch's conduct.

Pruitt's complaint and petition were accompanied by a handwritten motion requesting appointment of counsel. The motion appears to have been copied from a sample form; Pruitt included instructional language in various places. For example, Pruitt stated in the motion that he "respectfully moves this court, pursuant to his legal claim, you should ask at this point that counsel be required to

---

[1]  Pruitt has since been moved from Pontiac Correctional to the Pinckneyville Correctional Center.

read your documents, consult with me, and amend my petition." The motion later states: "I have sought institutional review of this matter through the proper grievance procedures before this action was filed, at this point, state what, if any, action was taken on, concerning my grievances." Pruitt filed a second, identical motion in February 2003.

On March 31, 2003, the district court granted Pruitt's petition to proceed *in forma pauperis* but denied his motions for appointment of counsel. The judge's order denying counsel is brief:

> Appointment of counsel is not warranted in this case. Neither the legal issues raised in the complaint nor the evidence that might support the plaintiff's claims [is] so complex or intricate that a trained attorney is necessary. It should additionally be noted that the court grants pro se litigants wide latitude in the handling of their lawsuits.

Pruitt's complaint was accepted and filed on April 30, 2003.

The defendants moved to dismiss. Pruitt responded with a four-page, typed document making coherent arguments and citing relevant case law. On its final page, Pruitt's response states: "Crafted by a Law Clerk at the request of Mr. Pruitt." Although the judge denied the motion to dismiss, he had the following observations about Pruitt's complaint:

> The plaintiff's jumbled, sixty page complaint is very difficult to decipher. The plaintiff has attached numerous documents in the middle (Comp., p. 9-36) and at the end of his complaint. (Comp., p. 40-60) Many of [these] documents appear to have little or no relevance to the claims in the main body of plaintiff's complaint.

The judge concluded Pruitt was making three claims: (1) that Mesch sexually harassed him in violation of the Eighth Amendment; (2) that the other defendants failed to protect him from Mesch's attacks; and (3) that an unrelated disciplinary report and hearing violated Pruitt's equal protection and procedural due process rights. The judge dismissed the third claim but allowed the first two claims to proceed.

Pruitt filed a third motion for appointment of counsel on July 6, 2004. This time he submitted a typed and notarized motion accompanied by exhibits. One exhibit contained the results of tests Pruitt underwent while incarcerated to determine the grade in school to which his educational level corresponds. According to that report, Pruitt tested at a reading level of 8.5 and a math level of 3.9, for an average educational level just above that of a sixth grader (grade level 6.2).[2] Also included were two letters he received in response to his effort to secure legal representation,[3] as well as two affidavits from Pruitt. One of Pruitt's affidavits states as follows:

> I Benjamin Pruitt, B-55009, I am making a state-meat about this c/o Mr:Mesch, #3240, sexiual-harassment me, (touching-my-private parts on my body), 5-day's a week. There are other inmate's that he do this too also but they are not talking about it because they believe that it will be a big problem with the c/o's down here, so the one's that I do have they will be my eye-witnesses . . . .

---

[2] The test result form indicates a combined score below 6.0 automatically places an inmate into the Adult Basic Education program.

[3] Only one of these letters is actually from an attorney; the other is from a legal staffing company Pruitt apparently mistakenly contacted.

On November 30, 2004, the district court denied Pruitt's motion in an order repeating verbatim the language of its March 2003 order.

On December 8, 2004, Pruitt appeared via video-conference before the district court for a brief pretrial hearing. During that hearing, the court attempted to determine the anticipated testimony of Pruitt's proposed witnesses. Pruitt responded generally:

> That this same officer mentioned he came into the unit harassing me, and every time I would go on a walk where we would go to chow, my whole unit my celly was there and some other—I'm sorry. A lot of them I allege as witnesses they would verify this same officer who harassed me.

He later stated: "The only thing they can say that they see him harassed and they seen them take me to the bathroom. That's what they can verify. What happened in the bathroom they don't know." Pruitt expressed some confusion when the judge asked him about the exhibits he would like to use at trial. The conference concluded with the court setting a trial date of February 14, 2005.

On December 27, 2004, Pruitt filed his fourth and final motion for appointment of counsel. This motion is nearly identical to his third but was also accompanied by a two-page letter to the clerk's office. In the letter, Pruitt attempted to explain the content of the attached exhibits and to reiterate his plea for appointment of counsel.[4] A relevant sample:

> [W]ith this attachment are a copy attach are showing the court's that the plaintiff's Benjamin Pruitt has a

---

[4] The first half of the letter reads as one continuous 16-line sentence, with capitalization of the first letter of the first word of each line.

6.2 in grade and has no knowledge of the law, nor do he has the ability to investigate the facts of the case, nor do he has the ability and/or locating interviewing the other inmate's which are (witnesses to the case of his (assoulted and harassed) . . . .

On January 25, 2005, the district court denied Pruitt's final request for counsel, again using the identical language of its prior two orders. After a brief final pretrial by videoconference, trial began as scheduled on February 14.

## B. Trial Proceedings

At the judge's prompting, Pruitt began his case with an opening statement to the jury:

Each one of my witnesses is going to verify that Officer Mesch just harassed me everyday. . . . At this time, the only thing I could say is that the witness they got now, I don't know if they are going to verify that they seen me went to the washroom at the time or just been seeing me out—I mean coming to chow.

I'm sorry. I'm sorry. I'm kind of nervous. Let's see. What do you want me to say now?

The judge continued to prompt Pruitt and asked him if he wanted to talk about the prison employees' alleged failure to respond to his complaints. Pruitt then continued:

No, they should have been charged me why they let the officers—why they do something to him. I ain't looking to go to seg or try to go to Tamms or nothing like that. I am trying to go home. I ain't trying to catch no time in the penitentiary. It's just telling me put a lawsuit or something.

The judge asked whether that was what Pruitt wanted to say for his opening statement. Pruitt responded: "I don't

know. Judge, I don't know how to defend myself. I don't know where to begin."

After the defendants' opening statement, the judge asked Pruitt to testify. The judge basically performed a direct examination, taking Pruitt through a series of questions to elicit both background information and his allegations against the defendants. With the judge's assistance and clarification, Pruitt testified that Mesch pulled him into the bathroom, told Pruitt he had a court order to examine some marks on his body, instructed Pruitt to remove his clothes, then proceeded to fondle Pruitt's penis. Pruitt testified that this incident was interrupted when another officer entered the bathroom, and that Mesch then allowed him to dress and return to his unit. Pruitt also testified about the attempts he made to report Mesch's conduct. Throughout Pruitt's testimony the judge provided repeated prompting and instructions about when the rules of evidence barred his testimony. Pruitt was then cross-examined, and the defense sought to impeach him with inconsistent statements from his deposition.

After his testimony Pruitt called five witnesses to the stand. Pruitt's examination of the first four—all prison inmates at Pontiac—consisted of asking them whether they recalled an incident between Mesch and himself.[5] One witness recalled an unrelated confrontation in which Mesch and another officer restrained Pruitt with handcuffs, but Pruitt maintained the witness must be confusing him with another prisoner. The other witnesses either could not recall Mesch or could not recall Pruitt. When

---

[5] Pruitt's initial witness list included 12 names, but Pruitt had no information regarding the current whereabouts or full names of prisoners who had since been released, so subpoenas were only issued for those witnesses still incarcerated.

these witnesses failed to remember the alleged incident, Pruitt unsuccessfully attempted to introduce his own affidavit as evidence of their recollections. His final witness was a hearing officer who handled a complaint Pruitt made, but she had no independent recollection of the complaint. Throughout the presentation of these witnesses, the judge often questioned them on Pruitt's behalf and prompted Pruitt to make objections or introduce evidence when necessary.[6]

The defense presented five witnesses: Mesch and prison employees who had been involved in the subsequent grievance process. When Mesch took the stand, Pruitt asked a series of questions regarding whether the officer remembered harassing him; Mesch denied any harassment or knowledge of Pruitt's complaints of harassment. Pruitt's cross-examination of the other witnesses generally consisted of asking whether they remembered receiving written complaints from him about the incident with Mesch, and asking no further questions if they did not. The judge would sometimes assist or take over questioning on Pruitt's behalf. After resting, the defendants moved for judgment as a matter of law, arguing that Pruitt's own testimony disproved his allegations.[7] The judge denied the motion, stating that Pruitt could prevail if the jury believed his testimony.

Pruitt began his closing argument by telling the court, "I don't know how to word it again." At the judge's prompting, he started over, telling the jury that he had testified

---

[6] The only exhibit Pruitt succeeded in introducing was a letter from a prison employee stating she had forwarded one of his complaints to internal affairs for investigation.

[7] While testifying, Pruitt mixed up a number of dates, sometimes placing his complaints about harassment before the harassment itself.

truthfully and did not know what else to say. He concluded by saying: "The evidence shows what I said and that's about all I can say right now." The defendants' closing argument focused primarily on discrepancies in Pruitt's testimony, and in a brief rebuttal, Pruitt tried to clarify some of those discrepancies. The case was then submitted to the jury, which returned in less than 30 minutes with a verdict in favor of the defendants.

Now represented by pro bono counsel, Pruitt challenges the denial of his four pretrial motions asking the district court to request counsel to represent him. On December 28, 2006, a divided panel of this court affirmed. *Pruitt v. Mote*, 472 F.3d 484, 489 (7th Cir. 2006) (*vacated* March 21, 2007). Judge Posner dissented on the ground (among others) that the tenor of the panel opinion would henceforward make discretionary denials of counsel practically unreviewable. *Id.* at 492 (Posner, J., dissenting). On March 21, 2007, we granted rehearing en banc and ordered supplemental briefing on the legal standard that governs the district court's decision whether to request counsel for a pro se litigant and the criteria the court should consider when deciding such a motion.

## II. Discussion

The federal *in forma pauperis* statute provides that "[a] court may request an attorney to represent any person unable to afford counsel." 28 U.S.C. § 1915(e)(1). The statute's use of the word "may" "clearly connotes discretion," *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 136 (2005) (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 533 (1994)), and its use of the word "request" allows "courts to ask but not compel lawyers to represent indigent[s]," *Mallard v. U.S. Dist. Court for S. Dist. of Iowa*, 490 U.S. 296, 307 (1989). Section 1915(e)(1) thus codifies the court's discretionary authority to recruit a lawyer to represent

an indigent civil litigant *pro bono publico*; it "does not authorize the federal courts to make coercive appointments of counsel." *Id.* at 310.

As members of a profession and officers of the court, however, lawyers "have obligations to their calling which exceed their obligations to the State," *id.* at 310 (Kennedy, J., concurring), and the Supreme Court has said that § 1915(e)(1) "may meaningfully be read to legitimize a court's request to represent a poor litigant and therefore to confront a lawyer with an important ethical decision." *Id.* at 308. Accordingly, we have previously noted that because "judges are usually able to find lawyers willing to accede to such 'requests,'" they are "as a practical matter . . . appointments." *Hughes v. Joliet Corr. Ctr.*, 931 F.2d 425, 429 (7th Cir. 1991). *In forma pauperis* plaintiffs typically ask judges to "appoint" counsel, and judges regularly construe motions seeking "appointment" of counsel—which Pruitt's four motions did—as motions seeking the court's assistance under § 1915(e)(1) in recruiting a volunteer.

When reviewing denials of § 1915(e)(1) motions on appeal, we have usually engaged in three inquiries: (1) has the indigent plaintiff "made reasonable efforts to retain counsel" or "been effectively precluded from making such efforts" before requesting appointment, *see Jackson v. County of McLean*, 953 F.2d 1070, 1073 (7th Cir. 1992); (2) "given the difficulty of the case, did the plaintiff appear to be competent to try it himself," *Farmer v. Haas*, 990 F.2d 319, 322 (7th Cir. 1993); and (3) "if not, would the presence of counsel have made a difference in the outcome," *id.* These three questions encompass elements of both the legal standard that guides the district court's exercise of discretion *and* the appellate standard of review; our cases have not always clearly marked the distinction between the two. Nor have we always been

consistent in articulating and applying the inquiries each question represents. We granted rehearing en banc to clarify the district court's obligations, and our own. We also take this opportunity to resolve conflicting statements in our case law regarding the interests that are—or more precisely, are not—at stake in this context.

## A. District Court Analysis

As we have noted, the language of § 1915(e)(1) is entirely permissive; it says the court "may" request an attorney to represent a person unable to afford counsel. Although the statute "legitimizes" the court's request for a pro bono lawyer, its language suggests no congressional preference for recruitment of counsel in any particular circumstance or category of case. Instead, the decision whether to recruit pro bono counsel is left to the district court's discretion. *Johnson v. Doughty*, 433 F.3d 1001, 1006 (7th Cir. 2006); *Farmer*, 990 F.2d at 323. This "does not mean that no legal standard governs that discretion. We have it on good authority that 'a motion to [a court's] discretion is a motion, not to its inclination, but to its judgment; and its judgment is to be guided by sound legal principles.'" *Martin*, 546 U.S. at 139 (quoting *United States v. Burr*, 25 F. Cas. 30, 35 (No. 14,692d) (C.C. Va. 1807) (Marshall, C.J.)); *see also McNeil v. Lowney*, 831 F.2d 1368, 1371 (7th Cir. 1987).

Pro se prisoner litigation and requests for pro bono counsel are pervasive in federal court; over time, our cases have settled on a general framework to guide the district court's exercise of discretion. When confronted with a request under § 1915(e)(1) for pro bono counsel, the district court is to make the following inquiries: (1) has the indigent plaintiff made a reasonable attempt to obtain counsel or been effectively precluded from doing so; and if so, (2) given the difficulty of the case, does the plaintiff

appear competent to litigate it himself? *Farmer*, 990 F.2d at 321-22. The first step in this analysis is not at issue in this appeal; we will not address it further except to reiterate that it is a threshold question the district court must ask before ruling on a § 1915(e)(1) motion. The second step is central to this appeal and requires clarification.

The decision whether to recruit pro bono counsel is grounded in a two-fold inquiry into both the difficulty of the plaintiff's claims and the plaintiff's competence to litigate those claims himself.[8] The inquiries are necessarily intertwined; the difficulty of the case is considered against the plaintiff's litigation capabilities, and those capabilities are examined in light of the challenges specific to the case at hand. The question is not whether a lawyer would present the case more effectively than the pro se plaintiff; "if that were the test, 'district judges would be required to request counsel for every indigent litigant.'" *Johnson*, 433 F.3d at 1006 (citing *Luttrell v. Nickel*, 129 F.3d 933, 936 (7th Cir. 1997) (quoting *Farmer*, 990 F.2d at 323)). Rather, the question is whether the difficulty of the case—factually and legally—exceeds the particular plaintiff's capacity as a layperson to coherently present it to the judge or jury himself.

We have sometimes said the district court's inquiry is whether the plaintiff appears competent "to *try*" his own case, *see, e.g.*, *Farmer*, 990 F.2d at 322; to the extent this formulation focuses solely on the trial stage of the

---

[8] *Farmer v. Haas* streamlined this circuit's earlier five-factor test, adopted in *Maclin v. Freake,* 650 F.2d 885, 887-89 (7th Cir. 1981), by condensing *Maclin*'s multiple factors into a simpler two-part inquiry into the difficulty of the case and the plaintiff's competence to litigate it himself. 990 F.2d 319, 321-22 (7th Cir. 1993).

proceedings, it is incomplete. The question is whether the plaintiff appears competent to *litigate* his own claims, given their degree of difficulty, and this includes the tasks that normally attend litigation: evidence gathering, preparing and responding to motions and other court filings, and trial. Recruitment of pro bono counsel under § 1915(e)(1) is not limited to the trial phase of the case. *See Hughes*, 931 F.2d at 430 (reversing a denial of a pro bono counsel based on the judge's general policy not to recruit counsel unless an evidentiary proceeding is warranted; the judge "should have considered Hughes's request [for counsel] in light of the particulars of his case rather than simply deny the request in accordance with a general policy").

There are no fixed requirements for determining a plaintiff's competence to litigate his own case; the judge will normally take into consideration the plaintiff's literacy, communication skills, educational level, and litigation experience. To the extent there is any evidence in the record bearing on the plaintiff's intellectual capacity and psychological history, this, too, would be relevant.[9] To inform the decision, the judge should review any information submitted in support of the request for counsel, as well as the pleadings, communications from, and any contact with the plaintiff. We recognize that the volume of pro se prisoner cases is great, and in some cases—perhaps many cases—the record may be sparse. The inquiry into the plaintiff's capacity to handle his own case is a practical one, made in light of whatever relevant evidence is available on the question.

---

[9] We do not mean to suggest that any factor is necessary or conclusive, but have identified these factors as among those that would ordinarily be relevant to the analysis.

Likewise, there are no hard and fast rules for evaluating the factual and legal difficulty of the plaintiff's claims. We have previously observed that some cases—those involving complex medical evidence, for example—are typically more difficult for pro se plaintiffs. *See Zarnes v. Rhodes*, 64 F.3d 285, 289 n.2 (7th Cir. 1995). But because the decision belongs to the district court, we have resisted laying down categorical rules regarding recruitment of counsel in particular types of cases. *Id.* at 288-89 (refusing to recognize a rule of "automatic appointment of counsel whenever a litigant alleges a violation of due process"). There are no presumptions for or against recruitment of counsel, whether based on the nature of the case *or* the degree of plaintiff competence. The inquiry into plaintiff competence and case difficulty is particularized to the person and case before the court. It is undertaken with due regard for the nature of the request at hand; before a judge will invoke his discretionary authority to press a lawyer into service on an indigent plaintiff's case pro bono, he first rules out the possibility that the plaintiff is competent to litigate it himself.

Of course when faced with a § 1915(e)(1) motion, the judge cannot know with certainty whether the plaintiff will actually prove to be competent to litigate his own case. He can only make a determination based on the record as it exists when the motion is brought, and our review is limited to the record at the time the decision was made (we will have more to say on this later). Accordingly, although the judge certainly has the discretion to do so, he has no *obligation* to reconsider a § 1915(e)(1) denial should future events prove the plaintiff less capable than the record indicated when the motion was denied.

Such an obligation might be inferred from our case law, which has routinely suggested that pro bono counsel may not be denied "if it would result in fundamental unfairness

infringing on due process rights."[10] *Gil v. Reed*, 381 F.3d 649, 657 (7th Cir. 2004); *see also Zarnes*, 64 F.3d at 288; *Jackson*, 953 F.2d at 1071-72; *McNeil*, 831 F.2d at 1371. This implies that at a certain point on the case-difficulty/plaintiff-competence continuum, a due process *entitlement* to counsel kicks in. Not so. We have also said it is a "fundamental premise that indigent civil litigants have no constitutional or statutory right to be represented by counsel in federal court." *Jackson*, 953 F.2d at 1071; *see also Johnson,* 433 F.3d at 1006; *Zarnes*, 64 F.3d at 288 ("Civil litigants do not have a right, either constitutional or statutory, to counsel."). In this regard, cases like *Jackson* and *Zarnes* are on both sides of the proposition; this conflict contributed to our decision to rehear this case en banc. We cannot on the one hand imply that the decision to recruit counsel under § 1915(e)(1) implicates the due process rights of the indigent civil litigant and on the other declare that indigent civil litigants have no constitutional right to counsel in federal court.

---

[10] This oft-repeated language is traceable to a case involving a collateral attack on a federal prisoner's guilty plea. *LaClair v. United States*, 374 F.2d 486, 489 (7th Cir. 1967) ("We hold that the law in this circuit is that appointment of counsel for indigents in habeas corpus and section 2255 proceedings rests in the sound discretion of district courts unless denial would result in fundamental unfairness impinging on due process rights."). Although we have repeated it many times in nonhabeas pro se prisoner cases, we have rarely elaborated upon its origins or implications, nor have we updated it in this context in light of more recent Supreme Court case law holding that due process does not require appointment of counsel for prisoners bringing collateral challenges to their convictions, *see Murray v. Giarratano*, 492 U.S. 1, 11-12 (1989); *Pennsylvania v. Finley*, 481 U.S. 551, 556-57 (1987), and discussing the scope of prisoners' right of access to the courts, *see Lewis v. Casey*, 518 U.S. 343, 354 (1996).

The general rule is that due process requires the provision of counsel to indigent litigants "only where the litigant may lose his physical liberty if he loses the litigation," *Lassiter v. Dep't of Soc. Servs. of Durham County,* 452 U.S. 18, 25 (1981), and that is possible only when the government brings the litigation.[11] Thus, due process does not require appointment of counsel for indigent prisoners pursuing state postconviction remedies or

---

[11] We note that the issue in this case does not implicate the question of what process is due when the purpose of civil proceedings is to effect a deprivation of a protected interest other than physical liberty, which again occurs only when *the government* initiates action (administrative or otherwise) against an individual, possibly triggering the right to due process protections. *See Mathews v. Eldridge*, 424 U.S. 319, 332 (1976) (holding that "procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment"; discussing what process is due before the government may administratively terminate an individual's social security disability benefits); *Lassiter v. Dep't of Soc. Servs. of Durham County*, 452 U.S. 18, 27-32 (1981) (due process does not require appointment of counsel to indigent parents in all termination-of-parental-rights cases, but the decision whether due process requires appointed counsel is to be decided by the trial court case by case); *Gagnon v. Scarpelli,* 411 U.S. 778, 790 (1973) (no per se right to appointed counsel at probation revocation hearing, which concerns only the revocation of the defendant's conditional liberty; right to appointed counsel is to be decided case by case). Ordinary federal civil litigation brought by individual plaintiffs against government actors adjudicates and redresses alleged violations of the plaintiff's rights (here, Pruitt's Eighth Amendment rights); it does not itself effect a deprivation of the plaintiff's protected interests. In other words, if the plaintiff loses the litigation, he is not deprived of a protected interest in the sense that is meant in the *Mathews v. Eldridge* line of due process cases; he just loses his case.

federal habeas relief. *Murray v. Giarratano*, 492 U.S. 1, 11-12 (1989); *Pennsylvania v. Finley*, 481 U.S. 551, 556-57 (1987); *Lostutter v. Peters*, 50 F.3d 392, 396 (7th Cir. 1995), *overruled on other grounds by Hogan v. McBride*, 74 F.3d 144 (7th Cir. 1996).

The Supreme Court has also made it clear that a prisoner's right of access to the courts does not guarantee the *effective* presentation of his civil claims.[12] The right of access to the courts protects prisoners from "being shut out of court," *see Christopher v. Harbury*, 536 U.S. 403, 413 (2002); it does not exist to "enable the prisoner . . . to litigate effectively once in court.*" Lewis v. Casey*, 518 U.S. 343, 354 (1996) (to expand the "right of access" to guarantee prisoners a right to "litigate effectively" would essentially "demand permanent provision of counsel, which we do not believe the Constitution requires"); *see also Bounds v. Smith*, 430 U.S. 817, 827 (1977) ("right of access to the courts requires prison authorities to assist inmates in the *preparation and filing of meaningful legal papers*" (emphasis added)).

Moreover, the interests of an indigent civil litigant in this context are not analogous to those of a criminal defendant whose competency must be monitored by the court throughout the proceedings to protect his due process right not to stand trial if incompetent. *See Drope v. Missouri,* 420 U.S. 162, 171-72 (1975); *Pate v. Robinson,* 383 U.S. 375, 378 (1966). Competency in criminal cases is subject to reevaluation because it is essential to a defendant's ability to exercise the fundamental procedural

---

[12] The precise source of the right of access to the courts has varied with the nature of the claim; it has been described as "a consequence of the right to due process of law" and also as "an aspect of equal protection." *See Murray*, 492 U.S. at 11 n.6; *Lewis*, 518 U.S. at 367 (Thomas, J., concurring).

rights guaranteed by the Fifth and Sixth Amendments.[13] *See Riggins v. Nevada*, 504 U.S. 127, 139-40 (1992) (Kennedy, J., concurring) ("Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so."). Those rights, and the due process protections recognized to safeguard them, exist because of the liberty interest implicated by a criminal prosecution.

Nothing in § 1915(e)(1) itself suggests an obligation to revisit an earlier denial of pro bono counsel. Accordingly, there is neither a statutory nor a constitutional duty to monitor whether an indigent litigant is competently litigating his civil claims after a § 1915(e)(1) request has been denied. The district court is required to exercise its discretion appropriately when presented with a motion seeking recruitment of pro bono counsel, but that is where its *obligations* end. The court certainly retains the discretion to adjourn a trial and recruit pro bono counsel if it appears as though an earlier denial of a request for counsel may have been ill-advised; doing so here might well have been prudent given Pruitt's obvious inadequacies. But the court has no general duty to do so, even where an indigent plaintiff ultimately proves incompetent to litigate his own claims.

---

[13] Accordingly, the analysis of "competence" in this context is not the same as the competence-to-stand-trial analysis in criminal cases. The latter, rooted in due process, requires the court to determine "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (quotations omitted).

**B. Appellate Review**

We review the denial of a § 1915(e)(1) motion for abuse of discretion. *Greeno v. Daley*, 414 F.3d 645, 658 (7th Cir. 2005); *Zarnes*, 64 F.3d at 288. "A court does not abuse its discretion unless . . . (1) the record contains no evidence upon which the court could have rationally based its decision; (2) the decision is based on an erroneous conclusion of law; (3) the decision is based on clearly erroneous factual findings; or (4) the decision clearly appears arbitrary." *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 755 (7th Cir. 2004) (quotations omitted). As with any discretionary determination, the question on appellate review is not whether we would have recruited a volunteer lawyer in the circumstances, but whether the district court applied the correct legal standard and reached a reasonable decision based on facts supported by the record.

Accordingly, we do not undertake our own analysis of the degree of case difficulty as against the plaintiff's competence to litigate it himself; that is the district court's inquiry, not ours. "Because of the particularistic character of the ruling and the fact that the district judge has the considerable advantage over us of having seen how the plaintiff handled [him]self in the pretrial proceedings, our review of the judge's decision not to request a lawyer for the plaintiff is deferential. We ask not whether [the judge] was right, but whether he was reasonable." *Farmer,* 990 F.2d at 322.

Appellate review is necessarily limited to the evidence available *when the § 1915(e)(1) motion was denied.* Although it is tempting to consider evidence postdating the court's ruling—especially where (as here) the pro se plaintiff's trial performance is particularly incompetent—this evidence can serve only two purposes, and both are improper on abuse-of-discretion review. First, such evidence might be used to infer the plaintiff *could not* have

appeared competent at the time the judge decided the § 1915(e)(1) motion. But "[e]rror is relative to what the judge reasonably could have known at the time he had to make his ruling." *Id.* Evidence unavailable at the time discretion was exercised cannot be used to demonstrate abuse of that discretion.[14]

Second, and relatedly, evidence postdating the decision might be used to show that the court's ruling, although reasonable at the time it was made, was proven unreasonable by the litigant's performance at trial. But "[i]f the judgment was sensible when made, the fact that after the trial it is apparent that the plaintiff was not competent to try the case after all will not establish error." *Id.* Were we to find error in the court's failure to recruit counsel based on evidence that developed *after* the motion was reasonably rejected, we would in effect be imposing a duty on the court to reexamine its prior ruling. As we have just explained, there is no statutory or constitutional basis

---

[14] In cases such as this one—where the district court simply fails to make *any* determination of the plaintiff's competence to litigate his own case—evidence postdating the denial of the motion has no bearing on the abuse-of-discretion determination. The judge's failure to make the proper inquiry is itself an abuse of discretion; consideration of the plaintiff's performance at trial is superfluous, except as it relates to prejudice. We note that here, the evidence before the district court at the time of Pruitt's third and fourth § 1915(e)(1) motions makes it implausible that the judge, had he considered the question, would have found Pruitt competent. That evidence included Pruitt's complaint, which the district court characterized as "jumbled" and "difficult to decipher," a coherent legal memorandum drafted not by Pruitt but by a prison law clerk in opposition to the defendants' motion to dismiss, additional written and oral communications reflecting Pruitt's confusion and general low functioning, and educational testing indicating Pruitt's skills were equivalent to that of a sixth grader.

for such a duty, although the judge has the discretion to revisit sua sponte a previous denial of pro bono counsel.

This is not to say poor performance at trial is irrelevant; to the contrary, it is critical to the question of prejudice, to which we now turn. Even if a district court's denial of counsel amounts to an abuse of its discretion, we will reverse only upon a showing of prejudice. *Id.* Although our cases have sometimes framed this inquiry in terms of whether the presence of counsel would have made a difference in the outcome, *see id.,* this does not mean that to establish prejudice the plaintiff must demonstrate that he would have won his case had he been represented by counsel. Instead, an erroneous denial of pro bono counsel will be prejudicial if there is a *reasonable likelihood* that the presence of counsel would have made a difference in the outcome of the litigation.

Unlike abuse of discretion, prejudice may be established by a litigant's poor performance before or during trial. For example, if the record demonstrates that the pro se plaintiff was incapable of engaging in any investigation; or locating and presenting key witnesses or evidence; or presenting a reasonably coherent opening statement, witness examinations, and closing argument during trial, the plaintiff may be able to establish a reasonable likelihood that the presence of counsel would have made a difference in the outcome. This is not to say every mistake along the way will establish prejudice; some erroneous denials of pro bono counsel will turn out to be harmless. Whether there is a reasonable likelihood that the presence of counsel would have altered the outcome depends upon a totality-of-the-circumstances review of the proceedings as a whole.

We recognize that litigation presents significant challenges for *all* pro se plaintiffs, especially pro se prisoner plaintiffs; many prisoners are poorly educated and most

are unfamiliar with the requirements and techniques of discovery, witness examination, and the application of the rules of evidence. Prejudice, like abuse of discretion, will be established—or not—in the particularized context of the case and the record before the court.

## C.  Pruitt's Motions

Here, the district court applied the wrong—that is, an incomplete—legal standard when reviewing Pruitt's motions for pro bono counsel. None of the three orders denying Pruitt's four motions makes any mention of his competence, either independent of or relative to his claims. Rather, the identical orders state that "neither the legal issues raised in the complaint nor the evidence that might support the plaintiff's claims [is] so complex or intricate that a trained attorney is necessary." This boilerplate gives no indication that the district court engaged in the required analysis of Pruitt's competence to litigate his claims; indeed, it flatly implies the court did not. The court's failure to undertake this necessary inquiry is an abuse of discretion. *Westever v. Snyder*, 422 F.3d 570, 583 (7th Cir. 2005) (failure to apply the correct legal standard is an abuse of discretion).

The defendants maintain Pruitt was not prejudiced because his case was too weak to succeed even with the assistance of counsel. This argument slightly misconstrues the prejudice inquiry. The question is not whether the case was a sure winner but for the absence of counsel; this is impossible to know. Rather, the question is whether assistance of counsel could have strengthened the preparation and presentation of the case in a manner reasonably likely to alter the outcome. This trial was a swearing contest. As the district court noted in denying the defendants' motion for judgment as a matter of law, Pruitt's testimony, if believed by the jury, was sufficient

to sustain a verdict in his favor. But fending for himself before and at trial severely compromised Pruitt's chances of persuading the jury, given his serious educational and forensic shortcomings.

Examples of these shortcomings abound, beginning with Pruitt's poor pretrial preparation. With the exception of a single document drafted by a prison law clerk, Pruitt's court filings were disorganized, very poorly written, and at times incoherent; the district court described the complaint as "jumbled" and "very difficult to decipher." Pruitt took no depositions and had significant difficulty explaining his anticipated testimony and exhibits during the pretrial videoconferences. To compound these problems, Pruitt's own deposition testimony—given without the benefit of preparation and assistance of counsel— supplied the principal means of contradicting his testimony at trial. An attorney could have significantly diminished these pretrial difficulties by helping Pruitt identify, locate, and prepare witnesses before trial, and avoid common deposition pitfalls.

Even with the substantial assistance he received from the district court, Pruitt's inept trial performance demonstrates the difference counsel could have made. Pruitt did not understand what an opening statement or closing argument entailed, and he proved utterly incapable of summarizing the facts of his case. He was barely able to provide a sequential account of the alleged assault by Mesch or his subsequent complaints to prison authorities, and his testimony became even more confused during cross-examination. Pruitt's direct and cross-examinations elicited little, if any, information from witnesses, and he succeeded in entering only one exhibit into evidence. At the very least, counsel could have helped Pruitt present his story to the jury in a more organized and coherent manner, and deliver a cogent opening statement and closing argument on his behalf.

In the end, the defendants' argument about the weakness of Pruitt's case rests on a conclusion that Mesch testified truthfully and Pruitt lied, which presupposes credibility determinations properly left to a finder of fact. The question for us on the issue of prejudice is whether there is a reasonable likelihood that Pruitt lost the swearing contest not because of the inherent weakness of his claim, but because of his incompetent preparation and presentation of it to the jury. On this record, we think there is a reasonable likelihood that Pruitt's claims failed on account of poor preparation and presentation.

Accordingly, Pruitt was prejudiced by the district court's denial of his requests under § 1915(e)(1), and the case must be returned to the district court for retrial with recruited pro bono counsel. We reach this judgment recognizing that the standard of review is deferential and reversal is justified only on a showing of harm. We appreciate that pro se prisoner cases have proliferated and each one presents special challenges for trial judges. We acknowledge that trial judges are better situated by position and experience to manage those challenges. The lawyers who accept prisoner cases *pro bono publico* are performing a valuable service for the court as well as the client. Pro se litigants, and the members of the bar who are asked to serve them as volunteers, are entitled to the court's careful consideration of any motion for pro bono counsel under § 1915(e)(1).

The principles reiterated here are intended to ensure that requests for pro bono counsel are resolved according to a consistent framework calibrated to the nature of the discretionary judgment called for by § 1915(e)(1). They are not meant to move the exercise of discretion toward recruitment of counsel more often than not, or more often than is now the case; we repeat that the inquiry is individualized to the plaintiff and case before the court.

Here, the district judge abused his discretion by applying the incorrect legal standard to Pruitt's requests for pro bono counsel, and the denial of those requests was ultimately prejudicial.

The judgment of the district court is REVERSED, and the case is REMANDED for recruitment of pro bono counsel and retrial.

ROVNER, *Circuit Judge*, with whom RIPPLE, WOOD, and WILLIAMS, *Circuit Judges*, join, concurring. I join the court in reaffirming that a district court must consider an indigent party's ability to litigate the case in ruling upon a request for counsel under section 1915(e)(1). Judge Sykes has carefully explained why, in light of that obligation, the district court abused its discretion in denying Pruitt's multiple requests for an attorney and why Pruitt was prejudiced by the refusal to recruit counsel to represent him. I share her views on both of these points. I part ways with the majority opinion in only one respect.

The majority declares that the district court has no ongoing duty to evaluate an indigent party's ability to handle the case alone and to sua sponte reconsider its earlier denial of a request for counsel when it becomes clear that a lawyer is needed. *Ante* at 15, 19. Although this was a subject raised by members of the court at oral argument, it is not clear to me why the majority resolves it in today's opinion. The court ultimately concludes that the district court, in denying Pruitt's multiple requests for counsel, abused its discretion by failing *ever* to con-

sider Pruitt's competence to litigate the case. *Ante* at 23. That holding leaves us with no need to decide whether the lower court had a continuing duty to monitor Pruitt's competence, and for that reason I would leave the question open. Given that the majority has gone out of its way to foreclose such a duty, however, I write separately to explain why, in my view, the court is wrong to do so.

Pruitt's case, because it survived initial screening and culminated in a trial, demonstrates the merit of requiring the district court to continually monitor an indigent party's competence to litigate the case pro se. To my mind, the notion that Pruitt was able to prosecute his case without the aid of counsel was dubious from the start: Pruitt's prolix complaint was, in the district court's words, "jumbled" and "very difficult to decipher"; Pruitt relied on a prison law clerk to prepare his (partially) successful memorandum in opposition to the defendants' motion to dismiss; and prison testing revealed that Pruitt's basic skills were equivalent to those of a sixth-grader. But if there ever was any plausibility to the notion that Pruitt could litigate this case on his own, it vanished once the trial got underway. When Pruitt told the judge in the first moments of the trial, "I don't know where to begin," he was not kidding; everything occurring thereafter was confirmation of that simple truth, from his incoherent opening statement to his near-total reliance upon the judge to elicit relevant testimony from his witnesses, including himself. Pruitt was essentially a bystander to his own lawsuit, and this was no more clear in the last moments of the trial than it was in the first. There was no point in allowing the trial to go forward under these circumstances. What the court should have done once Pruitt's incompetence was laid bare was call a halt to the proceedings and recruit counsel to represent him, even if that meant declaring a mistrial.

My colleagues in the majority do not dispute the logic of the obligation that I advocate; instead, reasoning that because neither due process nor one's right of access to the courts entitles a civil litigant to counsel, a court can have no ongoing duty to assess an indigent's ability to handle the case without representation. *Ante* at 15-19. I abstain from the constitutional discussion. Whether there is ever a constitutional right to counsel in a civil case is not a question that we asked the parties to brief, and the existence (or not) of a duty to monitor the indigent party's competence to litigate the case pro se does not depend on a constitutional entitlement to counsel. *See New York City Transit v. Beazer*, 440 U.S. 568, 582, 99 S. Ct. 1355, 1364 (1979) (court should refrain from reaching constitutional questions unless unavoidable); *National Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1126 (7th Cir. 1995) ("[I]f a sufficient non-constitutional ground of decision is available, a court must begin *and end* there. Constitutional adjudication is a last resort, and courts should do what they can to decide on other grounds.") (citations omitted) (emphasis in original). Our supervisory authority as a court of appeals permits us to require the lower courts to observe "'procedures deemed desirable from the viewpoint of sound judicial practice although in nowise commanded by statute or by the Constitution.'" *Thomas v. Arn*, 474 U.S. 140, 146-47, 106 S. Ct. 466, 470 (1985) (quoting *Cupp v. Naughten*, 414 U.S. 141, 146, 94 S. Ct. 396, 400 (1973)); *e.g.*, *Lemons v. Skidmore*, 985 F.2d 354, 356 (7th Cir. 1993); *see also United States v. Wecht*, 484 F.3d 194, 204-05 (3d Cir. 2007); *United States v. Nelson*, 277 F.3d 164, 208 (2d Cir. 2002); *United States v. Waters*, 158 F.3d 933, 944-45 (6th Cir. 1998); *Rand v. Rowland*, 154 F.3d 952, 959 (9th Cir. 1998) (en banc). Given the great number of suits filed pro se by prisoners and other indigent plaintiffs, the regularity with which we see appeals that challenge a district court's refusal to

recruit counsel pursuant to section 1915(e)(1), and the important role that an attorney plays in ensuring that a party's case is fully developed and presented, the district court's obligations with respect to the recruitment of counsel are appropriate subjects for the exercise of our supervisory powers.

Requests for counsel typically are made by plaintiffs (as opposed to defendants) at the outset of litigation, and at that stage district judges frequently, and with good reason, will deny those requests. The motions are often generic and identify no circumstance other than the plaintiff's lack of legal knowledge and ability—a disadvantage nearly all unrepresented litigants share—in support of the request. Many pro se suits turn out to be frivolous, and a judge justifiably will be reluctant to solicit pro bono assistance from the bar until she is sure that the case has at least some potential merit. In that regard, pre-trial motions under Federal Rules of Civil Procedure 12 and 56 serve an important screening function, disposing of the cases that have no legal or factual basis and leaving for trial a much smaller pool of cases in which the services of counsel arguably can be of the greatest benefit.[1] At the same time, a pro se plaintiff enjoys the benefit of certain presumptions early on in the case—including the assumed truth of the complaint's factual allegations at the pleading stage, and the bar on credibility determinations and resolution of factual disputes at the summary judgment stage—that give him a leg up. A district judge in turn has a wealth of knowledge and experience that

---

[1] This is not to suggest that a district court may automatically deny an indigent plaintiff's request for counsel simply because it has not yet survived a dispositive pre-trial motion. *See Hendricks v. Coughlin*, 114 F.3d 390, 393 (2d Cir. 1997). It is simply to say that many pro se suits have defects that are both readily apparent and beyond the ability of an attorney to remedy.

enables her to pierce inartfully drafted pleadings and to identify claims that are viable. A judge may justifiably conclude that a pro se plaintiff who can articulate the essential nature of his injury and present his version of the facts does not truly need the services of an attorney in the early stages of the case.

But once a viable claim has been identified and the litigation moves forward, the equities of the indigent plaintiff's request for counsel may well change. Those changes may become apparent on two different fronts: the demands that a particular case will place on the unrepresented litigant, and the litigant's demonstrated ability—or inability—to meet those demands.

First, as the case moves beyond the pleading stage, into discovery, and closer to trial, the plaintiff will face an increasingly complex set of demands. The presumptions that aid a plaintiff in the early stages of the case begin to drop away, and the plaintiff is obliged to gather and present evidence in order to sustain his burden of proof. In cases where the plaintiff himself was a witness to all of the relevant events, his ability to prepare an affidavit setting forth his version of events may enable him to respond effectively to a defendant's motion for summary judgment and, at trial, his testimony likewise may suffice to make the essence of his case. But where the plaintiff's claim necessitates the testimony of other witnesses (including in some cases expert testimony) or other evidence that is not in his possession, the assistance of an advocate may, as a practical matter, become necessary. An incarcerated plaintiff, for example, will have unique difficulties conducting even rudimentary discovery. And when it comes to nuanced legal issues like qualified immunity, deliberate indifference, and so forth, even a relatively sophisticated litigant may find it difficult to identify and present the right type of evidence. *See Merritt v. Faulkner*, 697 F.2d 761, 764 (7th Cir. 1983) ("Quite often

the factual and legal issues in a civil case are more complex than in a criminal case."). If the plaintiff manages to survive a defendant's pre-trial motions—as Pruitt was able to do with the assistance of a prison law clerk—trial of the case then presents him with a new and even more daunting set of challenges, particularly where the case is tried to a jury. There are, of course, some things that a district judge can do in aid of the pro se litigant to help compensate for his lack of legal expertise. Judge Baker, for example, commendably went out of his way to supplement Pruitt's examination of witnesses with his own questions, to signal Pruitt when he ought to object, and so forth. But a judge is constrained by a duty of impartiality, and whatever he might do to help an unrepresented litigant, he cannot be that individual's advocate. *See Pliler v. Ford*, 542 U.S. 225, 231, 124 S. Ct. 2441, 2446 (2004); *Donald v. Cook County Sheriff's Dep't*, 95 F.3d 548, 555 (7th Cir. 1996).

Second, as the litigation progresses, the court will have multiple opportunities to see how competent the litigant is to present his own case. The pleadings and memoranda that the litigant files, along with his interactions with the court and opposing counsel at pretrial hearings and conferences, will demonstrate the litigant's intelligence, verbal skills, ability to follow the court's orders, and his success in marshaling the facts and the law in support of his own case. Indeed, in many if not most cases, the court's first-hand observations of the litigant will prove more informative vis-à-vis his need for the assistance of counsel than the litigant's own section 1915 motion. There will be those plaintiffs whose knowledge and education enables them to comprehend the governing legal principles, produce relevant evidence, and present a cogent case to the court. But there will be others who reveal themselves to be unequal to the task for reasons that have nothing to do with the merits of their cases.

Nothing prevents the pro se litigant himself from asking the judge to reconsider the denial of his request for counsel, of course. But once the pro se litigant has been told that his situation does not warrant the recruitment of counsel (as Pruitt was told more than once), he understandably might think that the question has been decided once and for all and that a renewed request would be both pointless and likely to annoy the judge. Moreover, as between the litigant and the judge, it is the judge who is more likely to recognize that the litigant is in need of counsel. The litigant may realize that he is floundering, but only the court, with its legal knowledge, will realize just how much. Indeed, a pro se litigant may think that he has presented a compelling case, when it will be readily apparent to the judge that the litigant either does not comprehend the applicable legal standard or has no idea what type of evidence is relevant to that standard. The court is not powerless to act in such a situation even in the absence of a renewed request for counsel. There is an important distinction between being impartial and being passive. *See Sims v. ANR Freight Sys., Inc.*, 77 F.3d 846, 849 (5th Cir. 1996); *Pariser v. City of New York*, 146 F.2d 431, 433 (2d Cir. 1945) (A. Hand, J.); Ellen E. Sward, *Values, Ideology, and the Evolution of the Adversary System*, 64 Ind. L. J. 301, 321 n. 96 (1989). When confronted with evidence that his previous ruling on a question implicating the basic fairness of the proceedings was wrong, the judge ought to reconsider the matter sua sponte.

No purpose is served in allowing a case to proceed when the pro se litigant clearly cannot advance his own cause. Obviously it does no justice to the litigant. It is no true favor to his opponent either, given the inherent difficulties of litigating a case against an unrepresented party who has little or no understanding of the substantive law, let alone the rules of civil procedure and

evidence. Neither does it well serve the civil justice system. No case is an island unto itself; every one has potential consequences that extend beyond the individual parties. When a plaintiff prevails in an employment discrimination suit, for example, her victory can bring about changes in many employers' workplace policies; when she does not, her loss may be construed as a vindication of employers' current practices and discourage others from suing. *Cf. City of Riverside v. Rivera*, 477 U.S. 561, 574, 106 S. Ct. 2686, 2694 (1986) ("we reject the notion that a civil rights action for damages constitutes nothing more than a private tort suit benefitting only the individual plaintiffs whose rights were violated"). At a minimum, whatever the circumstances of an individual case might be, that suit will often require judicial rulings that establish precedents for the cases that follow. We rely on the adversarial process to aid courts in producing evidence and ascertaining the relevant facts, to articulate the arguments for and against particular holdings, and to anticipate the ramifications of the rules they adopt. *See In re Continental Cas. Co.*, 29 F.3d 292, 295 (7th Cir. 1994); *Merritt v. Faulkner*, *supra*, 697 F.2d at 764. The process is far from perfect, but to function as it is intended it must in fact *be* an adversarial process; it is anything but that when one side cannot competently make his own case. And although it is tempting to discount the jurisprudential significance of pro se litigation, experience teaches that such cases sometimes present questions with far-reaching consequences. *See*, *e.g.*, *United States v. Georgia*, 546 U.S. 151, 126 S. Ct. 877 (2006) (pro se suit by paraplegic state prisoner challenging conditions of confinement) (holding Title II of Americans with Disabilities Act abrogates state sovereign immunity insofar as it authorizes damages suit against state officials for conduct that violates Fourteenth Amendment); *Kolender v. Lawson*, 461 U.S. 352, 103 S. Ct. 1855 (1983) (pro se declaratory

judgment action challenging constitutionality of state vagrancy statute under which petitioner had been arrested and convicted) (declaring unconstitutionally vague statute requiring those who loiter on or wander public streets to provide "credible and reliable" identification and to account for their presence when asked to do so by police).

For these reasons, I believe that a district court has an ongoing responsibility to monitor a pro se litigant's conduct of the litigation and to sua sponte reconsider the litigant's request for counsel when the court realizes that the services of a lawyer are essential to a full and fair hearing of the litigant's claim. In satisfaction of that obligation, a conscientious judge will be proactive in managing the case, holding regular status hearings and taking such other steps as are necessary to satisfy herself that the unrepresented party both understands his obligations as a litigant and is capable of meeting them. *Cf. Schilling v. Walworth County Park & Planning Com'n*, 805 F.2d 272, 277 (7th Cir. 1986) (district court "should at least warn a *pro se* litigant of the possible consequences of any neglect" in litigating case); *Lewis v. Faulkner*, 689 F.2d 100, 102-03 (7th Cir. 1982) (pro se prisoner-plaintiff must be warned in plain English of consequences of failing to respond properly to defendant's motion for summary judgment).

This is not to say that a court's decision not to recruit counsel will be judged in hindsight based on information unknown to the court at the time of its decision. *Ante* at 20-21; *Farmer v. Haas*, 990 F.2d 319, 322 (7th Cir. 1993). A district judge is not expected to be omniscient or clairvoyant. When a judge reasonably concludes based on the evidence available to her that an indigent party is competent to litigate a case pro se, her decision to deny a request for counsel will be sustained on appeal as a permissible exercise of her discretion. Thus, if a pro se

litigant has proven competent in questioning witnesses during discovery and has been articulate in arguing his case to the court at pre-trial hearings, a judge might legitimately conclude that the litigant does not require the aid of counsel at trial. The fact that the litigant subsequently loses the trial, perhaps in part due to his own mistakes, will not call into question the propriety of the court's decision to deny him counsel. But a judge may not bury her head in the sand and ignore evidence that the pro se litigant lacks the ability to organize and present his case. She may not summarily conclude that the litigant does not need counsel when she lacks a basis on which to make an informed assessment of that need. Nor, in my view, may she conclude (however justifiably) in an early stage of the case that the litigant can handle things competently without representation and simply assume that her conclusion will hold true for the remainder of the case. As the litigation proceeds from one stage to another, the court ought to re-consider, in light of the indigent litigant's lengthening track record, whether the litigant is up to the demands of the next stage of the case. If the court has reason to believe he is not, it is time to reconsider the denial of the litigant's section 1915 motion. It is the judge who allows the case to move forward without making such an inquiry, or who ignores the signs of a litigant's incompetence, whose exercise of discretion (or failure to exercise such discretion) is at peril of being reversed on appeal.

All of this is common sense, of course, and many judges take such steps already. But given the relentless pressure of a busy docket, the number of frivolous suits that are filed by pro se plaintiffs, and a natural reluctance to dip into the pro bono well too often for assistance, a court may on occasion be too quick to dismiss a litigant's request for counsel. Requiring, rather than simply encouraging, courts to continue evaluating the unrepresented

litigant's need for counsel as the case progresses is a way to avoid the kind of wholesale failure of the adversarial process that occurred in this case. That obligation I submit, is implicit in "'the well-established duty of the trial court to ensure that the claims of a *pro se* litigant are given a fair and meaningful consideration.'" *Donald v. Cook County Sheriff's Dep't*, *supra*, 95 F.3d at 555 (quoting *Palmer v. City of Decatur*, 814 F.2d 426, 428-29 (7th Cir. 1987) (collecting cases)).

A true Copy:

     Teste:

 

                  _____
                  *Clerk of the United States Court of*
                  *Appeals for the Seventh Circuit*