NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with FED. R. APP. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted September 2, 2022[*]
Decided September 2, 2022

**Before**

DIANE P. WOOD, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

MICHAEL Y. SCUDDER, *Circuit Judge*

No. 22-1422

| | |
|---|---|
| SHOMAS T. WINSTON, | Appeal from the United States District |
| *Plaintiff-Appellant,* | Court for the Western District of |
| | Wisconsin. |
| *v.* | |
| | No. 20-cv-367-jdp |
| SHERRI A. PULDA, et al., | |
| *Defendants-Appellees.* | James D. Peterson, |
| | *Chief Judge.* |

**O R D E R**

Shomas Winston, a Wisconsin inmate, sued a doctor and two nurses under Wisconsin law and the Eighth Amendment for their treatment of a sprained ankle that healed quickly. Winston lost to the doctor at summary judgment and to the nurses at trial. He now argues that the doctor should have ordered an MRI and the court should

---

[*] We have agreed to decide the case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. FED. R. APP. P. 34(a)(2)(C).

have recruited him a lawyer for trial. But the lack of an MRI yielded no foreseeable harm, and the absence of counsel did not prejudice the trial; thus, we affirm.

Winston hurt his ankle playing basketball in late December 2019 and received medical attention. Over the next three days, he saw two nurses and told them he did not need crutches. A week later, after reporting that his left ankle was "bothering [him] still off and on," Winston met with nurse Sheri Pulda. Because Winston's ankle had minimal swelling and full range of motion, Pulda determined that he had sprained it and prescribed the prison's standard treatment regimen for that injury: take over-the-counter pain relievers, protect the injured area, then ice, compress, and elevate it. She also told Winston that he could walk on it to the extent the pain was tolerable (she later testified that walking increases blood circulation and promotes healing). Finally, she said that she would refer him to a doctor if his ankle did not improve.

Ten days later and dissatisfied with the pace of healing, Winston saw a doctor and received further treatment. He met with Dr. Frederick Kron, who ordered an x-ray but not an MRI (even though, according to Winston, Kron planned to do so). Pending the x-ray results, Kron told Winston to use crutches and a cast boot. The x-ray showed no abnormalities, and after a week, Winston reported that the swelling was nearly gone and that he felt much better. Kron diagnosed him with a sprained ankle and, in a note in Winston's medical file, wrote "PT ordered." When Winston later complained about not receiving that therapy, another nurse, Kris DeYoung, checked his medical records and told him that she did not see an order for physical therapy in his file.

Months later, Winston moved to another prison. While there, he received an MRI. It revealed a previously unknown, congenital flat-foot condition that was unrelated to his sprained ankle. Winston began to receive treatment for his flat foot.

Winston sued Kron, Pulda, and DeYoung, asserting violations of Wisconsin negligence law and his rights under the Eighth Amendment. As relevant on appeal, he alleged that Kron negligently failed to order an MRI; Pulda culpably let him walk on his ankle and failed to refer him to a doctor immediately after his injury; and DeYoung culpably failed to comply with Kron's instruction to arrange for physical therapy.

Winston unsuccessfully moved to recruit counsel. The court denied Winston's first motion because he had made no reasonable efforts to obtain counsel. It denied the second because it could not tell then if the case was too complex for Winston to litigate himself. The court allowed Winston to renew his motion once the issues became clearer.

The case ended adversely to Winston in stages. First, the district court granted Kron's motion for summary judgment. The court observed that no evidence suggested that the standard of care for treating an ankle with some swelling required an MRI or that Winston was harmed by Kron's decision not to order one. Then, before Winston's claims against Pulda and DeYoung went to trial, Winston moved again for recruitment of counsel, giving two reasons: he needed an expert to establish their standard of care and the case was too complex for him to try to a jury. The court denied the motion. Addressing only the first reason, it concluded that Winston did not need an expert because the jury could tell from its own experience whether either defendant was negligent or deliberately indifferent. Later, after a one-day trial, the jury returned a verdict in favor of Pulda and DeYoung.

On appeal, Winston contests only two rulings: the summary-judgment decision with respect to whether Kron should have ordered an MRI and the denial of his final motion for recruitment of counsel. We review the court's former decision de novo, *Pyles v. Fahim*, 771 F.3d 403, 408 (7th Cir. 2014), and the latter for abuse of discretion, *Pruitt v. Mote*, 503 F.3d 647, 658 (7th Cir. 2007) (en banc).

First, Winston argues that Kron was negligent under Wisconsin law because his failure to order an MRI violated the applicable standard of care, and an MRI would have revealed Winston's flat foot. But even if the standard of care for his ankle injury includes an MRI, Winston's claim fails. A negligence claim in Wisconsin requires evidence of a reasonably foreseeable harm. *See Tesar v. Anderson*, 789 N.W.2d 351, 354 n.7, 363 (Wis. 2010). But the harm that he attributes to the MRI's absence—a failure to detect his unrelated flat foot—was not reasonably foreseeable because no evidence suggests that, at the time of Winston's injury, Kron had reason to suspect that Winston had an unrelated flat-foot condition. Therefore, no rational jury could conclude that Kron should have foreseen that an MRI might reveal Winston's flat foot.

Second, Winston challenges the denial of his final motion for recruitment of counsel. Pulda and DeYoung concede that the court abused its discretion in denying this motion. The court had to weigh Winston's ability to litigate against the difficulty of the case, *see Pruitt*, 503 F.3d at 654–55, but it considered only Winston's need for an expert. Even so, they correctly observe, Winston must show that he was prejudiced by the denial. *See id.* at 659. That requires more than just a likelihood that counsel would have performed better than Winston at trial. *Mejia v. Pfister*, 988 F.3d 415, 420 (7th Cir.

2021). Rather, Winston must show a "reasonable likelihood" that the outcome would have been different with counsel. *Pruitt*, 503 F.3d at 659.

To demonstrate prejudice, Winston offers several arguments, but none shows a reasonable likelihood that, with counsel, the trial would have ended differently. He first argues that a lawyer might have successfully contested the defendants' pretrial motion to exclude evidence about his flat-foot condition, enabling Winston to argue at trial that the nurses exacerbated that condition when treating his ankle. But, as we just explained, that condition was not foreseeable; thus the jury could not have used such evidence to find Pulda or DeYoung negligent or deliberately indifferent. *See Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (deliberate indifference requires that defendant consciously disregard substantial risk of harm); *Tesar*, 789 N.W.2d at 363 (negligence requires foreseeable harm).

Next, Winston argues that counsel might have secured an expert. He contends that an expert could have shown that the nurses violated the applicable standard of care by letting him walk on his ankle (to increase blood circulation), not getting him a doctor immediately after his injury, and not scheduling physical therapy. But even if an expert established that these omissions violated the applicable standard of care, Winston produced no evidence that this conduct caused any short-term or long-term harm to him, as he must. *See Petties*, 836 F.3d at 728; *Tesar*, 789 N.W.2d at 363. To the contrary, he received the prison's standard (and unchallenged) treatment regimen for a sprained ankle: pain relievers and instructions to protect the injured area, ice it, compress it, and elevate it. Further, his swelling and pain were well-managed, he was offered crutches immediately (which he initially refused) and a boot to use as needed, and his ankle had mostly healed within three weeks without complications.

Winston also unpersuasively contends that counsel might have successfully sought a mistrial. During the trial, the defense suggested that even if DeYoung had overlooked Kron's order for physical therapy, Winston could not have received that therapy because of pandemic restrictions. But this contention did not necessitate a mistrial because Winston successfully objected to it, and the court instructed the jury not to consider it. We presume that jurors follow such instructions, *Wilson v. City of Chicago*, 758 F.3d 875, 885 (7th Cir. 2014), and Winston gives us no reason to believe that a lawyer could have upset that presumption.

Last, Winston cites other trial-presentation hardships that he faced—difficulties with PowerPoint, questioning witnesses, and organizing his case—but these do not

show prejudice from the absence of counsel. Although "inept trial performance" may establish prejudice, *Pruitt*, 503 F.3d at 661, Winston was not inept. He summarized the facts of the case, gave clear opening and closing statements, informed the jury of how the facts map on to each element of his claims, and adequately questioned witnesses about key facets of the case. *See id.*

AFFIRMED