**Bennie COOPER, Plaintiff–Appellant,**

v.

**A. SARGENTI CO., INC., Defendant–Appellee.**

**Docket No. 89–7031.**

United States Court of Appeals, Second Circuit.

Submitted Feb. 21, 1989.

Decided June 1, 1989.

Bennie Cooper, Hempstead, N.Y., pro se.

Douglas Menagh, Menagh & Trainor, New York City, for defendant-appellee.

Before OAKES, Chief Judge, NEWMAN, Circuit Judge, and LEVAL, District Judge.*

PER CURIAM:

This is a motion by the pro se plaintiff-appellant Bennie Cooper for appointment of appellate counsel, coupled with a motion by the defendant-appellee A. Sargenti Co., Inc. for dismissal of the appeal.

Although motions by indigents for appointment of appellate counsel are generally adjudicated in this court by conclusory endorsement, we write briefly on the subject to correct misunderstandings that may have arisen in the district courts of some of our earlier opinions concerning the related issue of appointment of trial counsel.

### The Trial

The complaint alleged that plaintiff's discharge from his job resulted from the employer's discrimination based on race and age. Stipulation showed that Cooper (who is black and 61 years old at the time of discharge) had a substantial record of absenteeism; in June of 1984 his employer, the defendant, had instituted arbitration proceedings under the collective bargaining

---

* Honorable Pierre N. Leval, Judge of the United States District Court for the Southern District of New York, sitting by designation.

agreement seeking authorization to discharge him. The arbitrator ruled that "although [the employer] may have had the right to dismiss Cooper at this time, [the employer] would agree to give Cooper another chance to show that he could be a satisfactory employee; ... the dismissal request shall be held in abeyance and Cooper shall be regarded as warned that his conduct and attendance shall be satisfactory and that the only reason for an absence shall be for a personal compelling and unavoidable circumstance, and regardless if the reason for an absence may be compelling and unavoidable, it must not occur frequently." Jt. PTO, p. 7, ¶ 19.

On December 10 of the same year Cooper phoned in that because of the death of his mother-in-law, he would not be at work. The governing rules of the collective bargaining agreement allowed an employee three days for a family bereavement. Cooper, however, did not return to work for 18 days. On December 18, the employer sent him a telegram saying, "You have not worked since Friday December 7. We have not heard from you. If we do not hear from you by Friday December 21, with a valid reason for your absence, we will proceed to commence termination of your employment." In January, the company instituted arbitration for authorization to terminate plaintiff. On January 9, 1985 the arbitrator ruled that the company had good cause for dismissal. On January 14, 1985, Cooper was dismissed.

Trial was conducted before a jury by Judge John E. Sprizzo. Cooper, who was represented by counsel, sought to prove that his discharge resulted from race bias and age discrimination on the part of his boss Robert Sargenti. The trial turned primarily on issues of credibility. Plaintiff testified that Sargenti had frequently demeaned him by racial slurs and insults. Sargenti denied this. Defendant called other employees who denied ever having heard such slurs. Defendant also proved that plaintiff had never complained of racial insults to co-workers or union representatives and indeed had not even made such complaints to the arbitrator at his discharge hearing.

To show a non-discriminatory reason for the discharge, defendant proved Cooper's frequent absenteeism. Defendant also showed that the problems caused by plaintiff's frequent absences were aggravated by his habitual failure, in violation of company rules, to call the employer at 7:00 a.m. to advise that he would be absent. This repeatedly left the company unprepared to replace him. During his extended unauthorized absence in December 1984 on the occasion of the death of his mother-in-law, he failed to communicate with the company to advise when he would return. Plaintiff testified that he had tried to telephone but the circuits were busy. When asked whether he ever tried to call at 7:00 a.m. (the appropriate time for such a call), he said no, explaining "I wanted to call at that time, but I was busy, you know, dealing with my wife and my father-in-law.... [M]y father-in-law, he had to have pills ... and I had to go to the drugstore and things to that effect for him." (Tr. 135.) The company also offered evidence that on one occasion when plaintiff was reprimanded for loafing and distracting other employees, he menaced his boss with a knife.

Upon all the evidence, it is not surprising that the jury discredited the plaintiff's contentions and found for the defendant.

### Plaintiff's Application for Appointment of Counsel

In recent years, we have twice discussed the standards for appointment of free counsel to indigent claimants in civil cases. In *Jenkins v. Chemical Bank*, 721 F.2d 876 (2d Cir.1983), and *Hodge v. Police Officers*, 802 F.2d 58 (2d Cir.1986), we remanded to the district court for further consideration whether requests of indigents for counsel should be honored. *Jenkins* was, like this, a case of alleged employment discrimination. The applicable statute provides that "in such circumstances as the court may deem just, the court may appoint an attorney." 42 U.S.C. § 2000e–5 (1976). The trial court had declined to appoint counsel upon plaintiff's application. Trial resulted in a defendant's verdict. On appeal, we noted that a district court exercises sub-

stantial "discretion," subject to the requirement that it be "guided by sound legal principles." 721 F.2d at 879. We stated that the criteria to be used in making the decision included the merits of plaintiff's case, the plaintiff's ability to pay for private counsel, his efforts to obtain a lawyer, the availability of counsel, and the plaintiff's ability to gather the facts and deal with the issues if unassisted by counsel. The factor which commanded the most attention in the brief discussion was the merits. We noted that an attorney need not be appointed "in every case which survives a motion to dismiss" and suggested that a negative EEOC determination, coupled "with potentially frivolous rebuttals by the plaintiff, would militate against appointment of a lawyer."

In *Hodge*, we revisited the issue in the context of a very similar statutory authorization applicable to civil actions generally. It provides that "[T]he court may request an attorney to represent any [indigent] person unable to employ counsel and may dismiss the case if the allegation of poverty is untrue, or if satisfied that the action is frivolous or malicious." 28 U.S.C. § 1915(d). After trial resulting in a defendant's verdict, plaintiff appealed based on the trial court's refusal to appoint counsel. Our discussion of the applicable criteria was quite similar to our review in *Jenkins*. Citing with approval the Seventh Circuit's formulation in *Maclin v. Freake*, 650 F.2d 885 (7th Cir.1981), we stressed the importance of the apparent merits of the indigent's claim. "Even where the claim is not frivolous, counsel is often unwarranted where the indigent's chances of success are extremely slim." We cautioned that this requirement "must be taken seriously. If mere bald assertions by an indigent, which technically put a fact in issue and suffice to avert summary judgment, required appointment of an attorney under § 1915(d), the demand for such representation could be overwhelming." 802 F.2d at 60. We therefore advised that the district judge "should first determine whether the indigent's position was likely to be of substance." Only "if the claim meets this threshold requirement, the court should then consider other criteria." Those secondary criteria include plaintiff's ability to obtain representation independently, and his ability to handle the case without assistance in the light of the required factual investigation, the complexity of the legal issues, and the need for expertly conducted cross-examination to test veracity.

We would have nothing to add to our discussion in *Hodge* were it not for our perception that it has been widely misinterpreted in the district courts. It is our understanding that, since the remand in *Hodge*, many district courts, rather than create an issue for appellate review, are automatically requesting volunteer counsel to assume representation, without regard to likely substantiality. We understand that since *Hodge* the volunteer lawyer panels of the district courts are drowning in requests. As a result, a bloated roster of cases seeking volunteer representation stagnates, and numerous court requests for representation are rejected by counsel. Our warning in *Hodge* about the consequences of indiscriminate appointments has proved accurate.

For many reasons courts should not grant such applications indiscriminately. Volunteer lawyer time is a precious commodity. Courts are given a major role in its distribution. Because this resource is available in only limited quantity, every assignment of a volunteer lawyer to an undeserving client deprives society of a volunteer lawyer available for a deserving cause. We cannot afford that waste.

Available volunteer-lawyer time should not be allocated arbitrarily, or on the basis of the aggressiveness and tenacity of the claimant. The phrase *pro bono publico* suggests meaningfully that distribution of this resource should be made with reference to public benefit. The ancient adage about "the squeaky wheel" may well be an accurate statement of a law of nature; it should not be adopted also as a law of prescription.

A further disadvantage of indiscriminate assignment is its capacity to demoralize volunteers and diminish an already inadequate resource. Injustice is not in short

supply. Lawyers who volunteer their services hope to be employed in an effort to remedy injustice. If they find repeatedly that their services instead are devoted to giving the semblance of merit to undeserving complaints, then instead of giving their time through the courts they will offer it to agencies that make better use of it, or will not offer it at all.

Two lines of reasoning are often cited in support of the appointment of counsel for indigent civil complainants. One is that society's moral obligation to provide free legal service to poor victims of legal abuse is no less compelling than its obligation to provide free medical care to the poor sick. The second is that our courts and remedies of law should be available to the poor, as well as to the rich, and that, without provision of free counsel, they are not realistically available. These concepts have certain force but also certain limitations.

The medical analogy may be excellent for deserving cases. Its value disintegrates, however, in undeserving cases because of important differences between the responsibilities of doctor and lawyer. A doctor who examines a malingering complainer can rapidly end the consultation saying, "You're not sick. Go back to work." In contrast, a lawyer who has undertaken to represent the client at the court's request is bound to champion his client's cause to the end—indeed, to try to make it appear meritorious when he knows it is not. Once a lawyer undertakes representation, that undertaking is not easily renounced. *See, e.g., Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967). Our concepts of fiduciary responsibility effectively tie the lawyer to the service of the client in a manner wholly different from a doctor donating free medical care.

The homily as to accessibility of the courts to rich and poor alike also has weaknesses. It is simply not true that the suits of individuals are generally financed by their personal means. Litigation long ago became so expensive that it exceeds the means of all but a tiny fraction of the population. As a general proposition, the availability of counsel for claims by individuals is determined less by the wealth of the claimant than by the merits of the claim. The vast majority of litigation on behalf of personal claimants is financed initially by lawyers who accept the representation for a contingent fee in the expectation of being rewarded by a share of the winnings. In addition to the contingency arrangement, there are statutes, including 42 U.S.C. § 1988, which guarantee pay to a prevailing lawyer at the expense of the adversary. Under these statutes, if the claim will prevail, the lawyer will be well paid without expense to the client, even though the lawsuit may involve only matters of principle without monetary award. Thus, in society at large, it is not so much the comparative wealth of potential claimants that determines whether they can succeed in obtaining the services of counsel, but the likely merits of their claim. If the claim has likely merit, a lawyer can take it with considerable confidence in being reasonably paid—sometimes very well paid.

These observations underline the importance of our ruling in *Hodge* requiring the indigent seeking a free lawyer to first pass the test of likely merit. That is not discrimination against the poor. It rather favors evenhanded standards. A claim that could not command a lawyer's acceptance if possessed by an employed middle-class property owner should not command a *pro bono* lawyer. The poverty of the claimant may often be irrelevant to his ability to secure counsel. If the claim is promising and relates to an injury that can be expected to produce substantial damages, a contingency lawyer will often be motivated to take it regardless whether the claimant is indigent or has property.

The same considerations underline the importance of a further factor we have stressed in *Jenkins:* the ability of the claimant to obtain a lawyer otherwise than through *pro bono* appointment. The *Hodge* opinion expressed the view that "the indigent [must] be unable to obtain counsel before appointment will even be considered." 802 F.2d at 61. As we suggested in *McDonald v. Head Criminal Court Supervisor Officer*, 850 F.2d 121 (2d Cir. 1988), on this issue the most important

disability of the poor claimant may be not so much his lack of funds but his lack of practical access to attorneys. If the indigent plaintiff is a prison inmate or a homeless vagrant, he may have no effective means of bringing his claim to the attention of the lawyer marketplace to have its merits appraised. *See Merritt v. Faulkner*, 697 F.2d 761, 768–69 (7th Cir.1983) (Cudahy, J., concurring) (the "laws of economics" although they might well attract a lawyer for other litigants, "take a different turn when prison walls intervene"). Thus a useful endeavor of courts (perhaps assisted by bar associations) in screening such applications would be to create mechanisms to insure that such claims of prisoners and other indigents be brought meaningfully to the attention of that segment of the bar which is economically motivated to assume representation in anticipation of winning contingent, or court-awarded, fees.

Courts do not perform a useful service if they appoint a volunteer lawyer to a case which a private lawyer would not take if it were brought to his or her attention. Nor do courts perform a socially justified function when they request the services of a volunteer lawyer for a meritless case that no lawyer would take were the plaintiff not indigent. Courts would, however, significantly advance the justified claims of the poor if they established mechanisms to insure that the claims of indigent, disadvantaged litigants will be reviewed by lawyers whose business is to pursue claims of similar nature. Such a brokerage service would be likely to find counsel for many with meritorious claims.

These considerations, especially a threshold showing of some likelihood of merit, should be borne in mind by trial and appellate courts in deciding whether to appoint counsel. For appellate courts, that threshold showing can be assessed with some rigor at least in cases such as the pending one where a trial record has been fully developed with the aid of counsel. In trial courts, the preliminary assessment of likely merit must be undertaken somewhat more generously since the unrepresented litigant might have difficulty articulating the circumstances that will indicate the merit that might be developed by competent counsel. In raising a caution against routine appointment of counsel, we do not mean to oblige indigent litigants to demonstrate that they can win their cases without the aid of counsel. In the pending case, we are satisfied that the showing of likely merit is entirely too insubstantial to warrant the appointment of counsel.

### Conclusion

The application for appointment of counsel is denied. Our failure to perceive merit in the appeal on our own should not, however, deprive the appellant of the opportunity to persuade us. The motion to dismiss the appeal is therefore denied.