In the

# United States Court of Appeals
## For the Seventh Circuit

No. 21-1055

WILLIAM WATTS,

*Plaintiff-Appellant,*

*v.*

MARK KIDMAN and BRAZOS URETHANE, INC.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 18-cv-49 — **James D. Peterson**, *Chief Judge.*

SUBMITTED NOVEMBER 18, 2021[*] — DECIDED AUGUST 2, 2022

Before EASTERBROOK, WOOD, and SCUDDER, *Circuit Judges.*

SCUDDER, *Circuit Judge.* Every day district courts receive motions from unrepresented litigants asking for the court's help finding them counsel. The requests come in all variety of

---

[*]We have agreed to decide this case without oral argument because the brief and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. See Fed R. App. P. 34(a)(2)(C).

civil cases—across all subject matters and degrees of complexity, in cases with potential merit and others with no chance of succeeding, and from litigants with vastly different abilities to communicate the factual basis for their claims and how they believe the law may apply to those claims.

In our en banc decision in *Pruitt v. Mote*, we set out a two-part inquiry to guide the analysis of whether to recruit counsel for an otherwise pro se litigant and emphasized that district courts must stay attuned to the individualized circumstances of each plaintiff and each case. See 503 F.3d 647 (7th Cir. 2007). In *Pruitt*'s wake, however, an important question has surfaced: may district courts make the decision whether to recruit counsel under 28 U.S.C. § 1915(e)(1) based, in part, on considerations of the strength or weakness of the underlying claims—in short, based on assessments of a litigant's prospect of prevailing?

We now answer that question yes, in keeping with *Pruitt*'s practical approach and mindful that, while appointed counsel make all the difference in the world in some cases, pro bono lawyers are not a limitless resource. Applying these considerations here leads us to affirm the district court's denials of William Watts's multiple requests for counsel.

**I**

In 2018 William Watts, a federal inmate, sued Brazos Urethane, Inc. and optometrist Dr. Mark Kidman. He alleged that an industrial primer used during a roofing project at his former correctional facility caused eye irritation that, when mistreated by Dr. Kidman, developed into glaucoma. The litigation proceeded for two years and ended with the district court entering summary judgment for the defendants.

On four separate occasions, Watts invoked 28 U.S.C. § 1915(e)(1) and asked the district court to recruit pro bono counsel to represent him. Watts's first motion accompanied his complaint. The district court denied that opening request, explaining that it was "too early to tell whether the case will be too complex for Watts to handle."

In 2019 Watts renewed his motion, and the district court again denied it. The court reiterated that its task in ruling on the motion was to determine "whether the legal and factual difficulty of the case exceeds Watts's demonstrated ability to prosecute it," and concluded that it remained too early in the litigation to tell. Based on its review of Watts's filings to that point, the court added that Watts "underst[ood] the basic legal principles that appl[ied] to his claims" and neither alleged nor exhibited any "difficulty reading, writing, or understanding the documents he has received from defendants or the court." The court further explained that it did not have enough information to "determine whether an expert will be necessary to prove some or all of [his] claims"—a decision that could not be made until "the parties ha[d] presented their respective version of events."

In March 2020 the district court denied Watts's third request for counsel, observing that nothing much had changed warranting a different ruling. None of the contentions advanced in his third motion—that the prison law library's resources were limited, for example, or that there was a significant discrepancy between his litigation ability and that of defendants' counsel—posed obstacles unique to him or this particular case. Rather, the district court observed, Watts's challenges were "the same challenges that all pro se litigants face." And because his "submissions so far show[ed] that he

is intelligent, understands the law, and is capable of explaining his version of events and making legal arguments," the court denied the third motion.

Discovery ensued and the district court eventually entered summary judgment for the defendants. By that stage of the litigation, Watts's primary remaining claims were state-law negligence claims. To prevail on the negligence claim against Dr. Kidman, Watts had to prove both that "[Dr.] Kidman failed to use the required degree of skill exercised by an average optometrist under the circumstances" and that this shortcoming caused the alleged injuries. The same general elements governed the negligence claim against the corporate defendant, Brazos Urethane.

The district court began by giving careful attention to whether Watts needed to provide expert testimony to prevail on his claims. It explained that, under Wisconsin law, "expert testimony is required to establish the standard of care" unless jurors' common knowledge "affords a basis for finding negligence." The court then reasoned that an "ordinary lay jury would not know whether [Dr.] Kidman's decision" to monitor Watts's eye condition himself, rather than refer him to an outside ophthalmologist or begin some other specific course of treatment, "fell below the standard of care for a reasonable optometrist faced with Watts's symptoms and test results." Nor would a lay jury know, without the benefit of expert testimony, "whether [Dr.] Kidman's wait-and-see approach worsened Watts's condition."

The district court reached a similar conclusion as to Watts's claim against Brazos Urethane, explaining that "Watts would need expert testimony to show that Brazos's failure to take additional steps to protect inmates amounted to a breach

of its duty of care to Watts." And because Watts had not presented expert testimony as to either standard of care, the court entered summary judgment for Dr. Kidman and Brazos.

Alongside doing so, the district court denied Watts's fourth motion for the recruitment of counsel. It reiterated that Watts had demonstrated he was "capable of gathering and presenting evidence and applying that evidence to legal principles," and had not persuaded the court, even at summary judgment, that the legal or factual difficulty of his case was beyond his ability to prosecute it.

To be sure, the district court recognized that "Watts, like most pro se litigants, would be unable to get an expert to support his case if he is not represented by counsel" and that his inability to do so proved fatal to his claim. But the dearth of expert evidence on the defendants' respective duties of care was not the only shortcoming in Watts's case. Both of his negligence claims also suffered from a major causation issue: nothing in the record indicated that, even with expert testimony, Watts could establish that "[Dr.] Kidman's wait-and-see approach worsened Watt's condition" or that his exposure to the industrial primer "caused ongoing dry eyes or glaucoma."

Had it been convinced that, "with the help of an expert, Watts might have a viable claim against" the defendants, the district court made clear that it would "consider attempting to recruit counsel" for him. But in the absence of evidence that Dr. Kidman provided negligent medical care or that Brazos Urethane's safety precautions were inadequate, the court concluded, Watts's case did not "warrant[] the recruitment of volunteer counsel." In the end, the district court took care to explain that it "cannot recruit counsel in every case in which a

pro se litigant makes a claim that might require expert evidence" because that approach would require the court "to recruit counsel for nearly every case involving a prisoner's allegation of medical negligence."

Watts appealed. Continuing to represent himself pro se, he challenges both the district court's entry of summary judgment for the defendants and refusal to recruit counsel under § 1915(e)(1).

## II

### A

Section 1915(e)(1) provides that a federal court "may request an attorney to represent any person unable to afford counsel." The statute "codifies the court's discretionary authority to recruit a lawyer to represent an indigent civil litigant *pro bono publico*; it 'does not authorize the federal courts to make coercive appointments of counsel.'" *Pruitt v. Mote*, 503 F.3d 647, 653 (7th Cir. 2007) (en banc) (quoting *Mallard v. U.S. Dist. Court for S. Dist. of Iowa*, 490 U.S. 296, 310 (1989)).

In *Pruitt v. Mote*, our landmark case in this area, we explained that the statute's language is "entirely permissive" with "the decision whether to recruit pro bono counsel left to the district court's discretion" and without any "congressional preference for recruitment of counsel in any particular circumstance or category of case." *Id.* at 654. But we also cautioned that the district court's discretion is not unbounded. Rather, a judge's decision making under § 1915(e)(1) "is to be guided by sound legal principles," as the pro se litigant's motion is an appeal to the court's judgment, "not to its inclination." *Id.* (quoting *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 139 (2005)). So, we instructed, district courts evaluating

motions for the recruitment of counsel should engage in a two-step inquiry: "(1) has the indigent plaintiff made a reasonable attempt to obtain counsel or been effectively precluded from doing so; and if so, (2) given the difficulty of the case, does the plaintiff appear competent to litigate it himself?" *Id.* at 655.

The second step can be complex. In *Pruitt*, we emphasized that a district court must consider both the "factual and legal difficulty" of a plaintiff's claims as well as "the plaintiff's competence to litigate those claims." *Id.* The court's competency evaluation should account for "the plaintiff's literacy, communication skills, educational level, and litigation experience," and, to the extent that such evidence is before the court, information "bearing on the plaintiff's intellectual capacity and psychological history." *Id.*

Neither inquiry can occur in a vacuum, however. "The inquiries are necessarily intertwined; the difficulty of the case is considered against the plaintiff's litigation capabilities, and those capabilities are examined in light of the challenges specific to the case at hand." *Id.* If the district court concludes that the difficulty of the case "exceeds the particular plaintiff's capacity as a layperson to coherently present it to the judge or jury himself," that conclusion must inform the district court's exercise of its discretion. *Id.*

So long as a district court's analysis follows this two-step process, we review the court's ultimate decision whether to recruit counsel deferentially. "[T]he question on appellate review," we emphasized, "is not whether we would have recruited a volunteer lawyer in the circumstances, but whether the district court applied the correct legal standard and reached a reasonable decision based on facts supported by the

record" and available to the court at the time of the decision. *Id.* at 658.

Our review does not end there. Even if we determine the district court has abused its discretion in denying a motion for recruitment of counsel, we will reverse only if the error prejudiced the litigant. In this context, "an erroneous denial of pro bono counsel will be prejudicial if there is a *reasonable likelihood* that the presence of counsel would have made a difference in the outcome of the litigation." *Id.* at 659 (emphasis in original).

B

Everyone familiar with our case law knows these standards. In the fifteen years since we decided *Pruitt*, however, a question about its application has surfaced—whether district courts are permitted in ruling upon a recruitment-of-counsel motion under § 1915(e)(1) to consider the strength or weakness of a plaintiff's claim. Our cases have sent mixed signals. We now answer the question in the affirmative, with an important qualifying observation.

1

For some years before *Pruitt*, the answer was settled. In *Maclin v. Freake*, we observed in broad terms that the "merits of the indigent litigant's claim" should be the first thing a district court considers. 650 F.2d 885, 887–88 (7th Cir. 1981) (setting out five factors for a court's consideration). This assessment was meant to go beyond the court's statutory authority to dismiss frivolous claims. See 28 U.S.C. § 1915(d) (1976) (authorizing courts to request an attorney to represent "any such person unable to employ counsel" and permitting the court to "dismiss the case … if satisfied that the action is frivolous or

malicious"). Indeed, *Maclin* observed that even if a plaintiff's claim is nonfrivolous, "counsel is often unwarranted where the indigent's chances of success are extremely slim." 650 F.2d at 887.

We applied the *Maclin* standard for years, reemphasizing time and again that a request for counsel must be evaluated with an eye toward the plaintiff's likelihood of success on the merits. See, *e.g.*, *McKeever v. Israel*, 689 F.2d 1315, 1320 (7th Cir. 1982) (explaining that the "threshold question" for a district court to take into account when ruling on motions for the appointment of counsel is "whether the claim is of sufficient merit"); *Heath v. Neal*, 909 F.2d 1486, at *1 (7th Cir. 1990) (unpublished table decision) (looking first to the "merits of [the petitioner's] claim and his chances of success at the time he filed his motion for counsel"); *Rivera v. Sardon*, 978 F.2d 1261, at *2 (7th Cir. 1992) (unpublished table decision) (instructing that of the *Maclin* factors, "the court first should consider whether the claim is of sufficient merit").

More than a decade later, we reaffirmed that the "factors identified in *Maclin* remain appropriate for evaluating § 1915(d) requests for counsel." *Jackson v. County of McLean*, 953 F.2d 1070, 1072 (7th Cir. 1992). But we also used *Jackson* to expand the scope of a district court's analysis, instructing that before the court "commenc[es] the *Maclin* examination," it should make a "threshold inquiry into the indigent's efforts to secure counsel." *Id.* at 1073. Engaging in such an inquiry is useful, we explained, because an attorney's unwillingness to prosecute the case is an additional, albeit imperfect, indicator that a plaintiff does not have "reasonable grounds for the suit [or] a reasonable possibility of success." *Id.*

One year later we decided *Farmer v. Haas* and streamlined the recruitment of counsel inquiry. See 990 F.2d 319 (7th Cir. 1993). Recognizing that multifactor tests had fallen out of favor in the law—and concluding that many of the *Maclin* factors were interrelated—*Farmer* instructed district courts to focus the recruitment of counsel inquiry on one question: whether "given the difficulty of the case," the "plaintiff appear[s] competent to try it himself." *Id.* at 322.

This streamlining may have left some ambiguity in our case law about whether district courts could consider the relative strength of a plaintiff's claim as part of the recruitment-of-counsel analysis. *Farmer* did not speak definitively on the issue. On the one hand, we implied that district courts should not consider the strength of the plaintiff's claim beyond determining whether the claim was "colorable." See *id.* at 321. But *Farmer* also cited with approval the Ninth Circuit's recruitment-of-counsel approach (which involves, in part, an evaluation of a plaintiff's "likelihood of success on the merits") and emphasized that we will only override a district court's discretion where it should have been "plain beyond doubt" that the decision not to recruit counsel would make it "impossible for [a plaintiff] to obtain any sort of justice." *Id.* at 322–23. Both observations suggest that the *Farmer* panel envisioned that its "exacting standard" governing the appointment of counsel would direct pro bono resources toward plaintiffs with relatively stronger claims and, in turn, better chances of prevailing. *Id.* at 323.

2

The dual-pronged guidance from *Jackson* and *Farmer* governed district courts' evaluation of § 1915(e)(1) motions until 2007, when we sat en banc in *Pruitt* to "clarify the district

court's obligations" and resolve inconsistencies in the articulation and application of the governing standard. 503 F.3d at 654. While *Pruitt* emphasized the importance of a practical approach, we did not expressly address whether a district court may consider the strength of the plaintiff's claim alongside its evaluation of the plaintiff's competency to litigate that claim on his own behalf. See generally *id.* at 654–58.

Some read the approach we announced in *Pruitt* as forbidding district courts from assessing the plaintiff's likelihood of success. See, *e.g.*, John R. FitzGerald, *Non-Merit-Based Tests Have No Merit: Restoring District Court Discretion Under § 1915(e)(1)*, 93 Notre Dame L. Rev. 2169, 2177 (2018) (contending that "[m]erit is explicitly excluded as a factor" in *Pruitt*, "under which district judges must appoint counsel if the prisoner has tried and failed to secure counsel independently and the issue is too complex for the prisoner to litigate on his own"). Indeed, some district judges in our circuit have understandably read *Pruitt* the same way. See, *e.g.*, *Cole v. Janssen Pharms., Inc.*, 265 F. Supp. 3d 892, 897 (E.D. Wis. 2017) ("Noticeably absent from the list of factors *Pruitt* instructs district courts to consider are the merits and substance of the pro se plaintiff's claim.") (cleaned up).

Even more, our own subsequent cases have, at times, arguably suggested that a district court's yes-or-no answers to the two specific questions outlined in *Pruitt*—whether the plaintiff had tried to secure his own lawyer and whether the plaintiff could competently litigate his own claim without one—are all that matters. "If the answer to the first question is yes and the answer to the second is no," we have said, "then the court must seek counsel to represent the plaintiff." *Walker v. Price*, 900 F.3d 933, 935 (7th Cir. 2018); see also *Pennewall v.*

*Parish*, 923 F.3d 486, 490 (7th Cir. 2019) (instructing that a district court "must request counsel" if the answer to the first question is yes and to the second no). On another occasion we even observed that questions about "whether recruiting counsel would affect the outcome of the case" are reserved for appellate review—and a district court's consideration of that issue constitutes an "appl[ication of] the wrong legal standard." *Navejar v. Iyiola*, 718 F.3d 692, 696 (7th Cir. 2013).

Only recently have we more directly explained that *Pruitt*'s emphasis on the practical nature of the § 1915(e)(1) inquiry allows district courts to consider the potential and relative merit of a particular plaintiff's claim. In *Pickett v. Chicago Transit Authority*, for example, we explained the importance of an indigent plaintiff's explanation for why he had been unable to secure his own counsel to the court's assessment of his § 1915(e)(1) motion. See 930 F.3d 869, 871 (7th Cir. 2019). If a plaintiff was able to "convey[] his situation well and counsel deemed the claim feeble," we said, "it would be inappropriate for a court to intervene" and ask "lawyers to devote less of their time to people with strong cases and more to people with weak ones." *Id.*

Since *Pickett* we have made the point more forcefully still, reminding district courts that "[n]othing in *Pruitt* or our other cases on recruiting counsel prohibits a judge from using available information and the judge's experience to assess the importance and potential merits of the case and to assign priority accordingly." *McCaa v. Hamilton*, 959 F.3d 842, 845 (7th Cir. 2020) (*McCaa II*).

That observation is sound. For *Pruitt*'s framework to be a truly practical one, it must also give district courts room to account for the reality in this circuit and every other around

the country—that the decision whether to recruit a lawyer for a particular plaintiff is made against the twofold backdrop of a high volume of indigent, pro se litigants (particularly incarcerated litigants) and a small pool, by comparison, of attorneys willing and able to take those cases on pro bono. See, *e.g.*, *McCaa v. Hamilton*, 893 F.3d 1027, 1036 (7th Cir. 2018) (*McCaa I*) (Hamilton, J., concurring).

Cases like Watts's hit the federal docket in droves. In the twelve-month reporting period ending March 31, 2022, for example, over 3,000 prisoner civil rights and condition-of-confinement cases were filed in the Seventh Circuit alone. See Table C-3, Judicial Business of U.S. Courts (2022), accessible at https://perma.cc/J2VE-VASL. Six of the seven district courts in our circuit saw more than four hundred such cases. See *id.* In our experience, the overwhelming majority of these plaintiffs are unrepresented. No doubt some cases lack merit, but "[s]ome may be among the most important that federal courts consider, to ensure that our society's treatment of prisoners meets at least minimum standards of human decency and humanity under the federal Constitution." *McCaa I*, 893 F.3d at 1036 (Hamilton, J., concurring).

"[L]egal time is scarce," and "[w]hen we compel a judge to divert the resources of the bar to weak claims … we reduce the likelihood that other persons will receive adequate legal assistance." *Eagan v. Dempsey*, 987 F.3d 667, 699–700 (7th Cir. 2021) (Easterbrook, J., dissenting in part). And even when pro bono attorney resources are devoted to litigating meritorious pro se claims, the ask from the court is significant: "[e]ven with donated lawyer time and talent," the out-of-pocket costs involved in necessary tasks such as taking depositions and procuring expert testimony can "easily surpass" the plaintiff's

realistic prospect for damages. *McCaa I*, 893 F.3d at 1036 (Hamilton, J., concurring); see also *Cole*, 265 F. Supp. 3d at 901 (Griesbach, J.) (explaining that, for certain types of cases, "[t]he time and money it would take to represent a plaintiff … is beyond what courts can reasonably expect a law firm to expend without any hope of recovery"). As such, we wholly agree with Judge Griesbach's observation that the reasonable course of action is for district courts to engage in "closer scrutiny … of the merits and what is at stake in a case before a judge uses his office to recruit a 'volunteer' attorney to represent the plaintiff." *Cole*, 265 F. Supp. 3d at 900.

At bottom, "courts must be careful stewards of the limited resource of volunteer lawyers"—particularly in districts where the demand for pro bono services far outpaces the supply of law firms or solo practitioners with "the resources to deploy aid." *Eagan*, 987 F.3d at 700 (Easterbrook, J., dissenting in part) (cleaned up). A permissible and important aspect of that stewardship is a district court's consideration of the perceived merits of—or likelihood of success on—an indigent plaintiff's claims in its decision whether to allocate scarce pro bono counsel resources to the case before it.

3

This direction aligns fully with *Pruitt*'s practical approach. *Pruitt* itself emphasized that the proper inquiry is one with "no hard and fast rules" and that requires a "particularized" assessment of "the person and case before the court … undertaken with due regard for the nature of the request at hand." 503 F.3d at 655–56. That must mean that, in allocating limited pro bono lawyer resources, a district judge is "able to make an educated and experienced assessment of how promising the plaintiff's case is, with or without counsel." *McCaa I*, 893

F.3d at 1036 (Hamilton, J., concurring). To the extent anyone sees this direction as a shift in our circuit's § 1915(e)(1) analysis, however, we have circulated this opinion to the full court under Circuit Rule 40(e), and no judge in active service requested to hear the case en banc.

Clarifying our case law in this way brings us in line with other courts nationwide. See, *e.g.*, *Cole*, 265 F. Supp. 3d at 897 ("[T]he law in this circuit appears significantly more favorable to indigent litigants than the law in other circuits, which generally allow a more searching evaluation of the merits before counsel is appointed.") (collecting cases).

Indeed, many other circuits relied on our reasoning in *Maclin* in instructing district courts to consider a plaintiff's likelihood of success on the merits as part of the recruitment-of-counsel analysis. See, *e.g.*, *DesRosiers v. Moran*, 949 F.2d 15, 24 (1st Cir. 1991) (instructing courts to examine the "total situation," including the "merits of the case" to determine whether there are "exceptional circumstances" warranting the recruitment of counsel and citing *Maclin*); *Cooper v. A. Sargenti Co., Inc.*, 877 F.2d 170, 172 (2d Cir. 1989) (explaining the circuit had cited "with approval the Seventh Circuit's formulation in *Maclin*" and "stressed the importance of the apparent merits of the indigent's claim," leading to a threshold determination of whether the "indigent's position was likely to be of substance"); *Tabron v. Grace*, 6 F.3d 147, 155 (3d Cir. 1993) (invoking *Maclin*'s instruction that "the district court must consider as a threshold matter the merits of the plaintiff's claim"); *Mars v. Hanberry*, 752 F.2d 254, 256 (6th Cir. 1985) (citing *Maclin* in support of the observation that the recruitment of counsel is not appropriate "when the chances of success are extremely slim"). At least one circuit has invoked *Maclin*'s

reasoning to perform a similar analysis in an unpublished decision. See *Harold v. Univ. of Colo. Hosp.*, 680 F. App'x 666, 671 (10th Cir. 2017) (citing an earlier Tenth Circuit decision that analyzed *Maclin* at length and explaining that a plaintiff has a burden "of demonstrating this his claim is sufficiently meritorious to warrant appointed counsel").

Other circuits have arrived independently at the same conclusion—that the merits of a plaintiff's case should inform the decision whether to recruit counsel. See, *e.g.*, *Aguirre v. Intelogic Trace, Inc.*, 980 F.2d 1443, at *1 (5th Cir. 1992) (unpublished table opinion) (outlining various factors for a district court's consideration in evaluating a request for recruitment of counsel for a Title VII claim, including "the merits of the claim"); *Crozier for A.C. v. Westside Comm. Sch. Dist.*, 973 F.3d 882, 890 (8th Cir. 2020) (explaining that if it is possible for a district court "to discern without adversarial presentations that all claims are likely to be insubstantial, then the court properly may weigh that reality when deciding whether to devote" attorney resources to the litigation); *Wilborn v. Escalderon*, 789 F.2d 1328, 1331 (9th Cir. 1986) (concluding that counsel should be designated only under "exceptional circumstances," a determination that requires an evaluation of "the likelihood of success on the merits" and the plaintiff's competency); *Poole v. Lambert*, 819 F.2d 1025, 1028 (11th Cir. 1987) (describing the appointment of counsel as a "privilege that is justified only by exceptional circumstances" and that does a service to both the court and the litigant by "limit[ing] litigation to potentially meritorious issues"); *Poindexter v. Fed. Bureau of Investigation*, 737 F.2d 1173, 1186–87 (D.C. Cir. 1984) (explaining, in the Title VII context, that "[i]f a suit has very little prospect of success, the benefit that attorney appointment provides the plaintiff may be offset by

the burden of litigation on the judiciary and the defendant, as well as on the appointed attorney"). See also D.D.C. L. Civ. R. 83.11(b)(3)(ii) (instructing that a judge's appointment of pro bono counsel should be sensitive to the "[p]otential merit of the *pro se* party's claims"). More recent cases from these circuits return to these early discussions of the issue. See, *e.g.*, *Fierro v. Smith*, No. 19-16786, 2022 WL 2437526, at *1 (9th Cir. July 5, 2022) (citing *Wilborn* to set out "the likelihood of success on the merits" as a factor considered under § 1915(e)(1)).

No matter the path of reasoning, however, and no matter how a court phrases its recruitment-of-counsel test, almost every circuit has explicitly instructed that a merits assessment should be part of the inquiry. See FitzGerald, 93 Notre Dame L. Rev. at 2175. No circuit, to our knowledge, has prohibited district courts from considering the strength of the plaintiff's claim as a factor. Compare *id.* at 2178 (observing only that the Fourth, Fifth, and Eleventh Circuits' tests do not have "an *explicit* merit or substance factor") (emphasis added).

None of this case law changed after Congress's 1996 amendment to § 1915. See Omnibus Consolidated Rescissions & Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321. Subsection (e) of § 1915 now requires district courts to dismiss not only frivolous or malicious claims, but also complaints that do not "state a claim on which relief may be granted." 28 U.S.C. § 1915(e)(2)(B)(ii). That courts have not changed course in the years since that amendment—or after the Supreme Court's pleading standard decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)—indicates they do not see the merits inquiry permitted under § 1915(e)(1) as duplicative of or

inconsistent with the screening function district courts assume in § 1915(e)(2).

Put another way, and to bring us full circle to our observation in *Maclin*: even where a litigant's claim is nonfrivolous and factually and legally plausible such that it survives § 1915(e)(2) screening, the recruitment of counsel is unwarranted if the plaintiff's "chances of success are extremely slim." 650 F.2d at 887; see also *Cole*, 265 F. Supp. 3d at 898 (Griesbach, J.) ("That a pro se litigant can assert a claim that can survive a motion to dismiss, however, is hardly an indication that it has sufficient merit for him to prevail."). A § 1915(e)(1) assessment mindful of the strength of a litigant's claim therefore aligns not only with a proper, practical-minded understanding of *Pruitt*, but with the type of analysis performed in courtrooms nationwide every day of the week.

4

A qualifying word of caution warrants emphasis. It is essential that district courts remain mindful, especially at the early stages of a case, that their evaluation of the plaintiff's claim is being made on uncounseled papers—early-stage pleadings written and submitted by litigants asking for the court's help due to incompetency, unfamiliarity with the law, or on the belief that a lawyer is almost certain to be a better advocate. See, *e.g.*, *Poindexter*, 737 F.2d at 1187 (explaining that a trial court's exercise of discretion should account for the fact that "the absence of an attorney for the plaintiff may make it difficult for the court to evaluate the merits of the plaintiff's claim" and that the trial court "should consider the information before it and, if necessary, make further inquiries of the parties").

The Second Circuit put the same point this way in *Cooper*: "the preliminary assessment of likely merit must be undertaken somewhat more generously since the unrepresented litigant might have difficulty articulating the circumstances that will indicate the merit that might be developed by competent counsel." 877 F.2d at 174. A district court must also be self-aware of its own blind spots—in some cases, it may be called upon to evaluate the likelihood of success of claims in unfamiliar and complicated areas of law. Its analysis may therefore consider the degree to which the court would benefit from the assistance of appointed counsel.

As we underscored in *Pruitt*, our goal in setting out principles guiding a court's § 1915(e)(1) determination is to "ensure that requests for pro bono counsel are resolved according to a consistent framework," not to "move the exercise of discretion toward recruitment of counsel more often than not" or toward recruitment more or less often than is now the case. 503 F.3d at 661. Ditto here. We do not expect that district courts' consideration of the relative merits of a particular plaintiff's case will lead to the appointment of pro bono counsel in more cases or in fewer cases. All we say today is that the merit of a plaintiff's claim is another factor a district court may consider while making an individualized determination whether to recruit counsel based on the plaintiff and the claim in front of it.

### III

In closing, we turn to Watts's appeal from the district court's denial of his four § 1915(e)(1) motions in this case. That Watts filed four motions over the course of his case is not unusual. District courts see this all the time. As we said in *Pruitt*, a district court's decision on a recruitment-of-counsel

motion is a "determination based on the record as it exists when the motion is brought"; denials are without prejudice, such that plaintiffs can (and often do) bring several motions. *Id.* at 656. Accordingly, courts have wide discretion to change course and "recruit pro bono counsel if it appears as though an earlier denial of a request for counsel [based on the court's evaluation of a plaintiff's competency] may have been ill-advised," *id.* at 658, or if, as the case progresses, factual or legal developments lead the court to revise its evaluation of the plaintiff's chances of success.

In its multiple orders explaining its denials of Watts's § 1915(e)(1) motions, the district court articulated and applied the exact right *Pruitt* framework, focusing its analysis on whether "the legal and factual difficulty of the case exceeds Watts's demonstrated ability to prosecute it" after it concluded that Watts had reasonably tried, yet failed, to secure his own counsel. At each stage, the district court made an individualized assessment attuned to Watts's abilities—with and without the assistance of a jailhouse lawyer—and the unique litigation demands that accompany the pleading, discovery, and dispositive motion phases of a case. Because Watts consistently demonstrated that he is "intelligent, understands the law, and is capable of explaining his version of events and making legal arguments," the court declined to recruit counsel. We see no abuse of discretion in the denial of these first three motions.

Nor do we see any error in the denial of Watts's final motion. In its summary judgment order, the district court acknowledged both that Watts, "like most pro se litigants, would be unable to get an expert to support his case if he is not represented by counsel" and that the absence of expert

testimony proved fatal to his state-law negligence claims. It further expressed sympathy for the position Watts was in and explained that "[t]he need for expert testimony factors heavily in [its] consideration for requests for counsel."

The district court ultimately decided not to recruit counsel because Watts had not adequately convinced the court that, with the help of an expert, he would have a viable claim. Each of Watts's claims fell short not only because he failed to establish, with expert testimony, the appropriate standard of care (or a breach of that duty), but also because he had a causation issue that the district court did not believe he could overcome. In light of these failures of proof, the district court concluded that "Watts's case, among the many for which counsel is requested"—including the dozens, if not hundreds, of prisoner medical negligence cases filed each year—did not "warrant[] the recruitment of volunteer counsel."

This merits-based aspect of the district court's recruitment of counsel was not an abuse of discretion. Based on the summary judgment record in front of it, the district court concluded that Watts's likelihood of success on his negligence claims was too remote to warrant marshaling scarce legal and expert resources toward his case. That analysis was wholly consistent with our *Pruitt* framework, and we will not disturb the district court's decision.

We have also reviewed Watts's other arguments challenging the district court's entry of summary judgment for both Brazos Urethane and Dr. Kidman, and none has merit.

For these reasons, we AFFIRM.