In the

# United States Court of Appeals

## for the Seventh Circuit

———————————

No. 21-2929

BRIAN J. JONES,

*Plaintiff-Appellant,*

*v.*

THEODORE ANDERSON, et al.,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 19-CV-1774 — **Lynn Adelman**, *Judge.*

———————————

ARGUED SEPTEMBER 8, 2023 — DECIDED AUGUST 29, 2024

———————————

Before SYKES, *Chief Judge*, and ROVNER and KIRSCH, *Circuit Judges*.

SYKES, *Chief Judge*. Brian Jones, a Wisconsin prisoner, sued several correctional officers for damages under 42 U.S.C. § 1983, accusing them of violating his Eighth Amendment right against cruel and unusual punishment. Jones's claims stem from a disturbance he created in the prison dayroom when he cursed at correctional officers and refused to return to his assigned cell. In response the officers placed him in a restraint

chair and transported him to a restrictive-housing cell. Before placing Jones in restricted housing, the officers strip-searched him as required by prison policy. Jones alleges that the officers used excessive force, conducted an unlawful strip search, and confined him in a dirty cell. The district court entered summary judgment for the officers on all claims.

Jones represented himself throughout the litigation below. With the assistance of volunteer counsel on appeal, he contends that the magistrate judge who handled the early stages of the case should have granted his request for the assistance of pro bono counsel under 28 U.S.C. § 1915(e)(1). This argument is meritless. The magistrate judge applied the correct legal standard and reasonably concluded that Jones was competent to litigate this straightforward case on his own. Moreover, no lawyer could have helped Jones prevail on his claims because most of the events in question were captured on video and the recording conclusively shows that Jones has no case. We affirm the judgment.

## I. Background

Jones is confined at the Columbia Correctional Institution, a maximum-security prison in Portage, Wisconsin. On the morning of May 20, 2019, he caused a disturbance in the prison dayroom. The incident began when he refused to return to his cell in the general population when instructed to do so by correctional officers. He complained that he would not go to any cell unit with stairs, telling the officers that he had a "low bunk low tier restriction." Lieutenant Theodore Anderson was summoned to the dayroom to address the problem. He told Jones that the officers were aware of his low-bunk status but explained that all cell units have stairs. Jones responded, "Well I ain't going to that cell. I don't know what

is so hard for you to understand, but you will have to carry me wherever we go."

The parties disagree slightly over the verbal exchange that took place next. The officers reported that Jones began to yell and swear at them, calling them "fucking idiots." Jones denies that he used profanity but admits that he "verbally expressed his frustration with staff" and refused to return to his cell. Regardless, because Jones continued to resist direct orders to return to his assigned cell, Lieutenant Anderson decided to transport him to the restrictive-housing unit using a restraint chair, which looks like a wheelchair with straps. Sergeant Nathan Fosshage was present during the encounter with Jones; Officer Jamie Dutton and Sergeant Kyle Ferstl also responded to assist.

At Lieutenant Anderson's direction, Sergeant Ferstl handcuffed Jones with his arms behind his back. Jones claims that he "felt and heard his bones cracking and snapping in his shoulder" when Sergeant Ferstl handcuffed him. Lieutenant Anderson directed Officer Dutton to put leg restraints on Jones. At this point, Lieutenant Anderson turned on his body camera to record the encounter.

Our account continues with a description of what appears on the video recording. When Lieutenant Anderson initially activated his body camera, Jones appears to be comfortable and relaxed, but he quickly became argumentative and hostile. He swore and yelled at the officers when Sergeants Ferstl and Fosshage eased him into the restraint chair. He also complained about pain in his wrists from the cuffs. Sergeants Ferstl and Fosshage fastened the safety belt across Jones and secured him in the chair.

Once Jones was secured, the officers wheeled him to the restrictive-housing unit in the prison. Lieutenant Anderson radioed the control room to inform them of the escort. Along the way another officer arrived with a camera to record the transport. Lieutenant Anderson activated that camera too and gave it to Officer Dutton to record the rest of the encounter. Officers Joshua Bender and Eric Fox responded to provide further assistance.

When the group arrived at the restrictive-housing unit, the officers prepared Jones for a strip search—a security precaution mandated by prison policy before inmates can be placed in restrictive-housing cells. The officers removed Jones's knee brace and walked him to the corner of the room where Sergeant Ferstl conducted the strip search. Officer Dutton, a female officer, was still present and operating the camera that Lieutenant Anderson had given her. She recorded the strip search from a distance, with several male officers standing between her and Jones, partially obstructing her view.

Sergeant Ferstl completed the strip search efficiently and without incident. When it was finished, the officers covered Jones with a towel around his waist and again secured him in the restraint chair. He continued to complain about his wrists, so the officers took him to the nurse for an examination. Jones complained extensively to the nurse about his general ailments, but the only pain he mentioned from the officers' actions that day was pain from handcuffs cutting into his wrists. The nurse examined Jones's wrists and did not see any blood or other injury, so she cleared him for placement in a cell. The officers then placed Jones in a restrictive-housing cell and gave him a smock to wear. Once inside, he stood near the door and complained some more about his wrists. His wrists are

visible in the recording; there is no sign of any injury. The video recording ends there.

Prior to placing Jones in the restrictive-housing cell, Officer Fox inspected the cell and found it clean. Jones claims that it was dirty. He says there were "dust bunnies" on the floor and a layer of film on the sink and toilet; he also claims that the mattress and pillow were stained. He adds that he could not access hygienic or toiletry items, though he admits that he received toiletry products and new clothing after "approximately 28 hours." Last, Jones says that he had to crawl on the cell floor because his knee brace was not returned to him during his confinement in restrictive housing. After two days he was returned to a cell in general population.

Jones sued the officers involved in these events seeking damages under 42 U.S.C. § 1983. He alleged that they violated his Eighth Amendment right against cruel and unusual punishment by (1) using excessive force against him; (2) conducting an unlawful strip search; and (3) confining him in a dirty cell. Jones proceeded pro se, but about six months into the litigation he asked the court to appoint pro bono counsel, asserting that he could not "find or understand the statutes and laws" and that the prison law library was inaccessible because of COVID-19 restrictions. He also told the court that other inmates had been assisting him with his filings. In support of the motion, Jones attached letters that he had written to lawyers seeking representation.

The magistrate judge assigned to handle case-management issues denied Jones's motion for pro bono counsel without prejudice, leaving the door open for a renewed motion later in the litigation. Jones did not renew the motion. The officers eventually moved for summary judgment on all claims.

The district judge granted the motion, and Jones appealed. We sua sponte recruited pro bono counsel for him on appeal.[1]

## II. Discussion

With the assistance of volunteer counsel on appeal, Jones challenges the magistrate judge's decision denying his motion for pro bono counsel and the district judge's order granting the officers' motion for summary judgment. Both decisions were sound.

### A.  Request for Counsel

Under 28 U.S.C. § 1915(e)(1), a federal court "may request an attorney to represent any person unable to afford counsel." The statute is "entirely permissive." *Pruitt v. Mote*, 503 F.3d 647, 654 (7th Cir. 2007) (en banc). Civil litigants have no constitutional or statutory right to court-appointed counsel, and § 1915(e)(1) "does not authorize the federal courts to make coercive appointments of counsel." *Id.* at 653 (quoting *Mallard v. U.S. Dist. Court for S. Dist. of Iowa*, 490 U.S. 296, 310 (1989)). Rather, the statute "codifies the court's discretionary authority to recruit a lawyer to represent an indigent civil litigant *pro bono publico*." *Id.*

"Almost everyone would benefit from having a lawyer, but there are too many indigent litigants and too few lawyers willing and able to volunteer for these cases." *Olson v. Morgan*, 750 F.3d 708, 711 (7th Cir. 2014). "District courts are thus placed in the unenviable position of identifying, among a sea

---

[1] Natalie D. Dygert and Kate Oh of Gibson, Dunn & Crutcher LLP accepted the appointment. They have ably discharged their duties. We thank them for their service to their client and the court.

of people lacking counsel, those who need counsel the most." *Id.*

Accordingly, we have recently explained that "the decision whether to recruit a lawyer for a particular plaintiff is made against the twofold backdrop of a high volume of indigent, pro se litigants (particularly incarcerated individuals) and a small pool, by comparison, of attorneys willing and able to take those cases on pro bono." *Watts v. Kidman*, 42 F.4th 755, 763 (7th Cir. 2022). Based on these and other practical considerations, we have held that district judges should engage in a two-step inquiry when faced with a request for pro bono counsel under § 1915(e)(1), asking first "(1) has the indigent plaintiff made a reasonable attempt to obtain counsel or been effectively precluded from doing so; and if so, (2) given the difficulty of the case, does the plaintiff appear competent to litigate it himself?" *Pruitt*, 503 F.3d at 654.

The first step needs no elaboration. Step two "can be complex" and involves a pragmatic judgment about the difficulty of the case and the plaintiff's ability to present it to the court on his own. *Watts*, 42 F.4th at 760. "The inquiries are necessarily intertwined; the difficulty of the case is considered against the plaintiff's litigation capabilities, and those capabilities are examined in light of the challenges specific to the case at hand." *Pruitt*, 503 F.3d at 655. A judge will normally consider "the plaintiff's literacy, communication skills, educational level, and litigation experience" along with any evidence in the record "bearing on the plaintiff's intellectual capacity and psychological history." *Id.* But these are merely factors that are ordinarily relevant. No one factor is "necessary or conclusive." *Id.* at 655 n.9. Indeed, "[t]here are no fixed requirements for determining a plaintiff's competence to

litigate his own case." *Id.* at 655. Ultimately, the "inquiry into the plaintiff's capacity to handle his own case is a practical one, made in light of whatever relevant evidence is available on the question." *Id.*

Finally, "the decision whether to recruit pro bono counsel is left to the district court's discretion." *Id.* at 654. Our job is to ensure that this discretion is exercised in accordance with appropriate legal principles. The "question on appellate review is not whether we would have recruited a volunteer lawyer in the circumstances, but whether the district court applied the correct legal standard and reached a reasonable decision based on facts supported by the record." *Id.* at 658. And even if we find an abuse of discretion, we will not reverse the district court's denial of a § 1915(e)(1) motion absent a showing of prejudice—in other words, reversal is warranted only "if there is a *reasonable likelihood* that the presence of counsel would have made a difference in the outcome of the litigation." *Id.* at 659 (emphasis in original).

Everyone agrees that Jones made a reasonable effort to obtain counsel, so our focus is on the second part of the *Pruitt* formula. At step two the magistrate judge applied *Pruitt*'s overlapping inquiry into the difficulty of Jones's case and his ability to litigate it himself. She noted first that Jones's Eighth Amendment claims are "not very complex" and concerned only matters of which he had personal knowledge. She also determined that Jones could capably handle his case on his own because his filings demonstrated that he is "articulate and can effectively advocate for himself." And she expressed a willingness to give him extra time to complete litigation tasks if needed.

That ruling was well within the bounds of the judge's broad discretion; she keyed her analysis to the correct legal standard and reached an eminently reasonable decision based on the information Jones had provided. Resisting this conclusion, Jones contends in general terms that the judge did not adequately address the difficulties he might encounter with discovery and legal research. These challenges are common to all pro se litigants; the magistrate judge reasonably concluded that the case was simple enough for Jones to present the gist of his claims to the court on his own. Jones also argues that he needed the assistance of a lawyer because COVID-19 restrictions hindered his access to the library. This concern too was not unique to Jones; all incarcerated pro se litigants had to deal with COVID-19 restrictions during the pandemic. Given the straightforward nature of Jones's claims, the magistrate judge reasonably concluded that whatever difficulties he encountered dealing with library closures could be addressed by extensions of time and other court interventions.

Jones's narrower arguments fare no better. He maintains that the magistrate judge disregarded or failed to consider the complexities that might arise in the more advanced stages in the litigation. But the judge denied the motion for counsel without prejudice and extended the deadlines for discovery and dispositive motions. Jones could have renewed his request for counsel later in the litigation but did not do so.

Jones also asserts that he needed a lawyer to help with his claim about his cell conditions because he had to prove that the officers acted with deliberate indifference to a health risk from his unclean cell. This argument is misplaced in the context of this case. It's true that *some* prisoner cases alleging that officials were deliberately indifferent to health and safety

risks "can be complex and difficult for a prisoner to litigate pro se." *McCaa v. Hamilton*, 959 F.3d 842, 846 (7th Cir. 2020). But there are no categorical rules in this area; every request for pro bono counsel requires a practical and particularized assessment that considers the complexity of the claims, the pro se litigant's capacity to litigate them himself, and the limited resources in the legal community to take on and underwrite pro bono litigation. Many claims involving allegations of deliberate indifference are straightforward and not beyond the capacity of a pro se litigant. The cell-conditions cause of action in this case is just such a claim.

In sum, the magistrate judge correctly applied the law and reached a reasonable decision to deny Jones's request for recruited pro bono counsel. We note as well that even if we were inclined to find that the judge abused her discretion (she did not), reversal would not be justified because no attorney could have changed the outcome here. As we explain next, the video recording conclusively refutes Jones's claims about excessive force and an unlawful strip search, and his cell-conditions claim is likewise meritless.

## B. Eighth Amendment Claims

We review the district judge's summary-judgment order de novo, viewing the record in the light most favorable to Jones and drawing all reasonable inferences in his favor. *Burton v. Downey*, 805 F.3d 776, 783 (7th Cir. 2015). But where the events in question were preserved in a video recording, we view the facts "in the light depicted by the videotape," provided that "[t]here are no allegations or indications that th[e] videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened." *Scott v. Harris*, 550 U.S. 372, 378, 381 (2007).

**1.** *Excessive Force*

The Eighth Amendment's protection against cruel and un-usual punishment prohibits the "unnecessary and wanton in-fliction of pain" on prisoners. *Hudson v. McMillian*, 503 U.S. 1, 5 (1992) (internal quotation marks omitted). In this context—an excessive-force claim arising out of restraints applied in a prison setting—the central question is "whether force was ap-plied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986) (internal quotation marks omitted). Relevant factors in the analysis in-clude "the need for the application of the force, the amount of force applied, the threat an officer reasonably perceived, the effort made to temper the severity of the force used, and the extent of the injury that force caused to an inmate." *Fillmore v. Page*, 358 F.3d 496, 504 (7th Cir. 2004). Importantly, *de minimis* uses of force do not implicate the Eighth Amendment. *Hud-son*, 503 U.S. at 9–10 ("The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" (quoting *Whitley*, 475 U.S. at 327)).

The video recording irrefutably establishes that the offic-ers used only *de minimis* force and they used it reasonably, not maliciously. Jones alleges that Sergeant Ferstl used excessive force when he handcuffed him before placing him in the re-straint chair; he contends that we must send this issue to a jury because the handcuffing occurred just before the video recording began. But the video did not need to "capture every second of every aspect of the transfer" to establish that no rea-sonable juror could credit Jones's account. *Fillmore*, 358 F.3d

at 504. The video does not suggest that Jones was experiencing the level of pain that one would expect if Sergeant Ferstl had used excessive force when handcuffing him, as Jones claims. *Id.* The recording begins immediately after he was placed in handcuffs. Jones claims that the bones in his shoulder "cracked and snapped" during the handcuffing. But the video shows him sitting comfortably in no apparent pain immediately after he was handcuffed. And when the nurse examined Jones roughly 20 minutes later, he did not complain about an injury to his shoulder, focusing instead on his complaints about wrist pain.

Jones also claims that the officers used excessive force when they placed him in the restraint chair, applied the leg restraints, removed him from the restraint chair, and held him during the strip search. The video captures all these events (although the strip-search portion is partially obscured by the officers who positioned themselves between Jones and Officer Dutton). The video shows that the officers used only minimal force (if any at all) to secure him in the restraint chair and conduct the strip search. Some application of physical contact was necessary because Jones repeatedly refused to return to his cell and even demanded that the officers carry him. Despite his resistance, the video shows that the officers were able to maneuver him into the restraint chair, secure him there, and complete the strip search with only minor physical contact against his wishes. There was no violent force, only a minimal degree of unwanted physical contact—not enough to characterize as anything more than *de minimus* force for Eighth Amendment purposes. And the nurse examined Jones immediately after the strip search; she cleared him for placement in a cell after finding no injury.

No juror viewing this evidence could reasonably conclude that the officers wantonly and sadistically inflicted pain on Jones. *See Whitley*, 475 U.S. at 322.

### 2. *Strip Search*

Strip-searching a prisoner violates the Eighth Amendment only if it is "maliciously motivated, unrelated to institutional security, and hence totally without penological justification." *Whitman v. Nesic*, 368 F.3d 931, 934 (7th Cir. 2004) (internal quotation marks omitted). To overcome summary judgment, Jones had to produce evidence showing that the officers conducted the search in a harassing manner intended to "humiliate and inflict psychological pain." *Id.*

Here again the video evidence conclusively establishes that the strip search was neither malicious nor performed in a harassing manner. Prison policy requires officers to perform a strip search before placing an inmate in the restrictive-housing unit. That is unquestionably a legitimate penological justification; it promotes the safety and security of inmates and prison staff alike. The video recording shows that the officers performed the search in a respectful, professional, and measured manner.

Jones argues that the presence of Officer Dutton, a female correctional officer, was gratuitous and humiliating. Participation in a strip search by an officer of the opposite sex may raise Eighth Amendment concerns if the officer is not performing a legitimate penological function but instead is an "invited spectator[]" whose presence is intended to cause embarrassment. *Calhoun v. DeTella*, 319 F.3d 936, 940 (7th Cir. 2003). That's not what happened here.

Officer Dutton was one of the first officers to respond when Jones caused the disruption in the dayroom. Then, at Lieutenant Anderson's direction, she recorded Jones's transfer from the dayroom to the restrictive-housing unit. She did not participate in the strip search, but instead recorded it from a distance and her view was limited by several male officers who stood between her and Jones during the search. She was, in short, performing a legitimate penological function in a reasonable way; she was not present to embarrass or humiliate Jones.

### 3. *Cell Conditions*

To prevail on an Eighth Amendment claim concerning the conditions of his confinement, a prisoner has the burden to prove that the conditions were objectively so severe that he was deprived of "the minimal civilized measure of life's necessities" and that prison officials acted with "deliberate indifference" with respect to the conditions. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). To prove the objective component of the claim, a prisoner must show that "the conditions were sufficiently serious as an objective matter" and created "an excessive risk" to his health and safety. *Thomas v. Blackard*, 2 F.4th 716, 719 (7th Cir. 2021) (internal quotation marks omitted). To prove the subjective component, he must show that the prison officials he has sued had actual knowledge that he faced "a substantial risk of serious harm and disregard[ed] that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847.

Jones's allegations fall short of a cognizable constitutional claim. To start, recall that he was confined in the restrictive-housing unit for just two days. He says that his cell had "dust bunnies" on the floor, a layer of "film" on the toilet seat and

sink, and a stained mattress. There's a factual dispute about this claim, but even if we accept Jones's allegations as true, the degree of uncleanliness he describes does not amount to a deprivation of the minimal civilized measure of life's necessities as an objective matter—especially not for the short duration of two days. Jones also claims that he was deprived of hygienic products for the first 28 hours of his two-day confinement in restrictive housing. A short-term deprivation of hygienic products, even one that causes considerable discomfort or unpleasantness, does not raise a constitutional concern. *See Lunsford v. Bennett*, 17 F.3d 1574, 1580 (7th Cir. 1994) (stating that the deprivation of toilet paper and other hygienic supplies for "approximately a twenty-four period" is merely a "temporary discomfort" that "hardly violates common notions of decency"). And even if we assume for the sake of argument that the conditions Jones describes were objectively severe, there's no evidence that any of the officers were aware of them and deliberately disregarded an excessive risk of harm to Jones.

Jones's final allegation about his confinement in restrictive housing requires a bit more attention. Jones alleges that he had to crawl on the floor for two days because he did not have his knee brace. Assuming without deciding that his two-day lack of access to his supportive orthopedic equipment satisfies the objective-severity requirement, there is no evidence that the officers were aware that his knee brace was not returned to him during the entirety of his confinement in restrictive housing. He has neither alleged nor provided evidence that they knew he did not have access to his brace during this time, much less that they were aware that the deprivation created a risk of excessive harm to him.

Jones argues that the officers should have known that he was deprived of his knee brace for his entire time in restrictive housing because they removed the brace before the strip search. This argument sounds in negligence, not deliberate indifference. It implies that they had a duty to ensure that the knee brace was returned to him at some point after he was secured in his restrictive-housing cell. But "it is not enough to show that a state actor should have known of the danger his actions created. Rather, a plaintiff must demonstrate that the defendant had actual knowledge of impending harm which he consciously refused to prevent." *Tesch v. Cty. of Green Lake*, 157 F.3d 465, 476 (7th Cir. 1998) (internal quotation marks omitted).

AFFIRMED